HON. DIANE WAYNE, (Ret.)
JAMS
707 Wilshire Blvd, 46th Floor
Los Angeles, CA 90017
Telephone: (213) 620-1133
Fax: (213) 620-0100

ARBITRATOR

**JAMS**

| | |
|---|---|
| ASTRID UNRINE, | JAMS Ref. No.: 1220046530 |
| Claimant, | **FINAL AWARD** |
| vs. | |
| ACUITY SPECIALTY PRODUCTS, INC. and ZEP, INC., | Arbitrator: Hon. Diane Wayne (Ret.) |
| | Hearing Date: July 14, 2014 |
| | Time: 12:30 P.M. |
| Respondents. | Location: Telephonic |

The Arbitrator, having considered all the pleadings and evidence both oral and documentary, now FINDS, CONCLUDES, AND ORDERS as follows:

**FINAL AWARD**
- 1 -

1

## I.  THE PARTIES

2    Claimant in the present action is Astrid Unrine ("Claimant" or "Unrine"). Claimant is

3  represented by Daniel J. Palay, Esq. of the PALAY LAW FIRM, APC and by Alejandro P.

4  Gutierrez, Esq. of the LAW OFFICES OF HATHAWAY, PERRETT, WEBSTER, POWERS,

5  CHRISMAN & GUTIERREZ, APC. Respondents in the present action are Zep, Inc. ("Zep")

6  and Acuity Specialty Products, Inc. (collectively, "Respondents"). Respondents are represented

7  by Anna Suh, Esq. and Kurtis A. Powell of HUNTON & WILLIAMS LLP

8

## II.  THE HEARING

9    A hearing on Claimant's Motion for Attorney's Fees, Costs, and Interest and on

10  Respondents' Motion to Strike and Cross-Motion for Attorney's Fees was held telephonically

11  before the Honorable Diane Wayne (Ret.) (the "Arbitrator") at 12:30 p.m. on July 14, 2014 (the

12  "Hearing"). At the Hearing, Daniel J. Palay, Esq. and Alejandro P. Gutierrez, Esq. appeared on

13  Claimant's behalf, and Y. Anna Suh, Esq. appeared on Respondents' behalf.

14

## III.  PROCEDURAL HISTORY & JURISDICTION

15    Prior to the commencement of this Arbitration, Ms. Unrine was an unnamed putative

16  class member in *Britto et al. v. Zep Inc., et al.*, Case No. VG10553718 ("Britto v. Zep"), a class

17  action lawsuit filed in the Alameda Superior Court on December 30, 2010. (*See* Astrid Unrine's

18  Request for Judicial Notice ["RJN"], Exh. 1 (*Britto v. Zep* Complaint for Damages)). On June

19  28, 2011, Ms. Unrine signed a Settlement Agreement and Release (the "Settlement Agreement"),

20  under which she agreed to release all claims related to the *Britto v. Zep* action in exchange for

21  $27,000. (Respondents' Exhibits ["Resp."], Exh. 206.) On May 7, 2012, the superior court

22  denied class certification in the *Britto v. Zep* action. (RJN, Exhs. 2 (denying Motion for Class

23  Certification), 6 (denying Motion for Reconsideration).)

24    On December 24, 2012, a group of fifty-seven Zep employees who had been putative

25  class members in the unsuccessful class action brought a separate suit, *Aguilar v. Zep Inc*, in the

26  Alameda Superior Court (Case No. RG12661127) ("Aguilar v. Zep"). (RJN, Exh. 10.)

27  Respondents successfully removed that case to federal court, *see Aguilar v. Zep Inc.*, 13-CV-

28  00563-WHO, 2013 WL 5615688 (N.D. Cal. Oct. 10, 2013), on February 8, 2013. (*See* RJN,

Exh. 11 (Notice of Removal of Action filed in U.S. District Court). The Hon. Richard Seeborg,

1  was assigned to that case. On May 9, 2013, Judge Seeborg issued an order granting

2  Respondents' Motion to Compel Arbitration (RJN, Exh. 12), but denying Respondents' Motion

3  to Enforce the Settlement on the grounds that Respondents' motion failed—and in fact did not

4  even attempt—to satisfy the summary judgment standard necessary to prove their defense of

5  prior settlement. (RJN, Exh. 13.)

6       Claimant's case was then assigned to the Arbitrator. The Arbitrator therefore has

7  jurisdiction over the present claims pursuant to the Hon. Richard Seeborg's May 9th Order. (*See*

8  *id.*) The Arbitrator also has jurisdiction pursuant to arbitration clauses contained in the

9  *Alternative Dispute Resolution Policy and Agreement for Disputes Between a Sales Rep and*

10 *Acuity Specialty Products, Inc. doing business as Zep Sales and Service* dated February 17, 2012

11 and executed by both parties.

12      A trial was conducted on March 4, 2014 at which Claimant prevailed on her claim for

13 expense reimbursement. Pursuant to the Arbitrator's Interim Award dated April 22, 2014,

14 Claimant submitted the Motion for Attorney's Fees, Costs, and Interest underlying this Order on

15 May 2, 2014. On June 2, 2014, Respondent submitted a Cross-Motion for Attorney's Fees, or, in

16 the Alternative, Offset to Claimant's Fee Request.

17                    IV. PLEADINGS AND ARBITRABILITY

18      The present claims are set forth in Claimant's Demand for Arbitration dated June 27,

19 2013 and in Respondents' Response and Statement of Counterclaims dated July 18, 2013. In the

20 former, Claimant incorporates and asserts the claims that were made in the underlying lawsuit

21 (*Aguilar v. Zep*), claiming that the Settlement Agreement she executed is null and void and that

22 she is entitled under California law for reimbursement of (a) alleged unlawful deductions from

23 her commissions, and (b) unreimbursed business expenses. She also seeks prejudgment interest

24 on any damages award and attorneys' fees. Respondents have also submitted counterclaims for

25 (1) breach of contract, (2) declaratory relief, and (3) unjust enrichment. All claims asserted

26 herein are arbitrable.

27                 V. FACTUAL BACKGROUND & FINDINGS OF FACT

28      The following is a statement of those facts found by the Arbitrator to be true and

1  necessary this Final Award. To the extent that this recitation differs from any party's position,
2  that is the result of determinations as to credibility and relevance, burden of proof considerations,
3  and the weighing of the evidence, both oral and written. In response to Respondents' objections,
4  only relevant and admissible evidence has been considered.

5  In essence, the present case is a dispute over the legality of Respondent's alleged failure
6  to reimburse Claimant Unrine for business expenses incurred in the course of her employment
7  and not reimbursed by Respondent Zep, as well as of Respondents' routine practice of deducting
8  from Claimant's commissions the costs of ZEP items, such as samples, novelties, and product
9  literature, given to customers and prospective customers by Claimant. Claimant asserts that both
10  of these practices are unlawful under California law. Respondents maintain that such actions do
11  not violate California law and that, in any event, Claimant's claims are barred by the Settlement
12  Agreement executed on June 28, 2011. (See Resp., Exh. 206.) Claimant counters that such
13  Agreement is void and unenforceable under a variety of theories.

14  Respondent Zep is a company engaged in the distribution and sale of sanitation services
15  and supplies, including janitorial supplies, cleansing compounds, floor brushes, floor polishing
16  and scrubbing machines, mopping equipment, and related items. (Resp., Exh. 201, preamble.)
17  Claimant Unrine, age 75, is a current Zep sales representative and has been employed by Zep in
18  that capacity since October 1980, or for 33 years. (Id., Exh. 202; Claimant's Exhibits ["Claim."],
19  Exh. 1.) A number of third parties are also particularly relevant either because they were
20  involved in the events leading up to this dispute or because they offered testimony in the present
21  case, including (1) Tom Moffett, Zep's President of North America Sales and Service, (2) John
22  Morgan, Zep's current CEO, (3) Mark Grossman, Zep's current Director of Sales for the western
23  region, (4) David Henson, who served as Zep's Director of Sales for 19 years, (5) Greg Stadler,
24  another former Zep employee who served as California Regional Sales Manager, and (6) Lynn
25  Woodford, a current California Sales Representative, who testified in the present case.

26  A. **Claimant's Incurrence of Business-Related Expenses & Respondents' Failure to Reimburse**
27  At the time of hire in 1980, Claimant signed Zep's "Salesman's Exclusive Account
28  Contract" ("Employment Contract"), (see Resp., Exh. 202.), as well as certain addendum

agreements. (*See id.*, Exhs. 203, 204.) The policy set forth in that Contract remained in place until 2011, when the *Britto v. Zep* lawsuit caused the company to re-evaluate its commission structure. (*See* Claim., Exh. 3 (Zep's April 7, 2011 Position Statement).)

The relevant time frame in this case is December 2006 until June 30, 2011. During that time, Claimant's sales position required her to incur certain Zep-related business expenses in order to sell Zep products and services. (Transcript of March 4, 2014 Hearing ["H. Tr."], 97:23-98:15.) Claimant has submitted evidence and testimony regarding her business expenses, which included business mileage and auto expenses, cell phone charges, costs associated with maintaining a separate business line, computer and internet expenses, printing and postage costs, costs of tools and materials (including parts for repairing and maintaining machines at customer locations), travel expenses, meal and entertainment expenses, and office supply costs. (Resp. Exh., 212 (Unrine Statement of Expenses); Claimant's Exhs. 11, 32 (confirming the types of expenses outside sales representatives were expected to incur without reimbursement).) Claimant also frequently incurred unreimbursed installations costs. When Claimant had to install dispensers at a particularly large facility, for example, Claimant would often hire outside help to complete such installations in a timely manner. She was not reimbursed for these expenditures. (H. Tr. 106:20-107:25.)

The evidence unambiguously shows that Zep's corporate policy (until 2011) was that outside sales representatives were *not* reimbursed for business-related expenses. Claimant was not directly reimbursed for such expenses. She was never asked to submit documentation to Zep regarding such expenses, nor issued any separate checks for those expenses. (H. Tr., 43:7-45:25 (Grossman testimony confirming that no documentation regarding mileage, telephone, internet, or computer expenses was requested, nor did any such expenses appear on payroll documents); 98:3-9 (Unrine testimony); 203:13-15; 208:14-18 (Grossman testimony).) Indeed, the Employment Contract, which exclusively governed the Parties' relationship from the period of 1980 through 2011, expressly provides: "The Salesman agrees that all expenses incurred by him in connection with his employment, including but not limited to, expenses of travel, entertainment, solicitation, and other sale expense shall be paid by him, and shall *not be reimbursed by the Company.*" (Resp. Exh. 202 (¶ 2(d) (emphasis added)); *see also* Claimant's

**FINAL AWARD**
- 5 -

1  Exh. 32 (Declaration of Greg Stadler, ¶ 6).)

2  At trial, testimony from supervisors confirmed this written policy. Specifically, Greg
3  Stadler, who was employed with Zep for over 20 years in various managerial capacities, testified
4  that it was Zep's clear and well-known "policy that it did not reimburse business expenses to its
5  outside sales personnel." (Claimant's Exh. 32, ¶ 6 (Declaration of Greg Stadler ["Stadler
6  Decl."])) Similarly, the testimony of Tom Moffett, Zep's President of North America Sales and
7  Service, confirmed that no portion of sales representatives' reimbursement was identified and
8  apportioned as "expense reimbursement." (Claimant's, Exh. 18 (Moffett Depo. 46:2-16).)

9  Claimant has also submitted testimony and evidence that, during this time, Zep was
10  generally *aware* that its outside sales representatives were incurring these types of expenses in
11  the course of performing their employment obligations. (*See* Claimant's, Exh. 8 (various letters
12  written by Zep from 2000 to 2010, confirming Zep's policy that outside sales representatives are
13  expected to incur certain business expenses—such as "automobile expenses, leasing,
14  maintenance, insurance, gasoline[,] . . . [l]odging when traveling, phone, fax, meals[,] and other
15  related expenses of travel[,] [e]ntertainment of clients[,] . . . [and] home office expenses"—all of
16  which would *not* be reimbursed); Exh. 19 (Deposition of David Henson ["Henson Depo."], at
17  41:5-54:25 (testimony that, during his "19-plus years" as a Zep director of sales, Henson was
18  aware that sales representatives incurred certain business expenses, including auto, phone,
19  internet, computer, repair and maintenance, and home office expenses, which Zep did not
20  reimburse)); Exh. 32 (Stadler Decl. (stating the same)).)

21  In fact, Zep *required* Claimant, as a sales representative, to use her vehicle and maintain
22  insurance thereon and to incur cell phone and internet to conduct certain employment obligations
23  that Zep itself imposed on Claimant. (H. Tr. 34:7-24 (testimony by Mark Grossman, current
24  director of sales for Zep's western region); 93:16-20 (testimony by Claimant).) For example,
25  sales representatives were required to make at least 20 calls per day; they were also required to
26  have a home office, equipped with internet and a business line, in order to place customer orders.
27  And having a cell phone was a practical necessity because Claimants were required to spend
28  substantial amounts of time travelling to meet clients. (Claimant's, Exh. 9; H. Tr. 93:19-22;
102:7-13.) Moreover, a fundamental aspect of sales representatives' duties was to demo

1  products, which necessarily required them to meet with current and prospective clients on
2  location. (*Id.*; H. Tr. 94:21-95:23.) Zep also encouraged employees to spend more time driving
3  to customer locations (i.e. using their vehicles for business purposes) and less working from
4  home. (Claim., Exh. 9.)

5        In response to the *Britt v. Zep* lawsuit, however, Zep adopted a new "California Sales
6  Representative Business Expense Reimbursement Policy" (the "2011 Reimbursement Policy"),
7  which went into effect July 1, 2011. (Claimant's, Exhs. 4, 6.) Among other things, the 2011
8  Reimbursement Policy provided that California sales representatives "who are compensated on a
9  commission-only basis will be reimbursed for their necessary business-related expenses, through
10  the apportionment of 10% of commissions"; the policy also provided a procedure for
11  reimbursement of expenses in excess of that amount. (Claim., Exh. 6, p. 3.)

12        Claimant testified that, prior to this 2011 Policy, she was never told that Zep provided
13  elevated commissions, or any other type of compensation, to cover such expenses. (*Id.*, Exh. 32,
14  ¶ 7; H. Tr., 98:16-99:1.) Indeed, the Employment Contract makes no reference to any such
15  commission structure, but rather merely provides: "The Company will pay the Salesman a
16  commission of 50% of the profit on the sales made by the Salesman after deducting the cost of
17  the merchandise sold plus a sum equal to 10% of the sales price for overhead expenses." (Resp.,
18  Exh. 202 (¶ 2(a)).) And, from October 1980 until mid-2011, there was no other written
19  agreement regarding Claimant's employment-related expenses. (H. Tr. 36:18-22; 87:14-17
20  (Grossman testimony); 97:16-22 (Unrine testimony).)

21        Claimant thus seeks the following amounts in unreimbursed business-related expenses:
22  (1) $5,123.25 for December 2006; (2) $28,236.00 for 2007; (3) $18,680.47 for 2008; (4)
23  $28,097.00 for 2009; (5) $20,188.50 for 2010; and (6) $10,191.06 for January through July,
24  2011, for a total of **$110,516.28** in unreimbursed business expenses. The Arbitrator notes that
25  Claimant has kept impeccable records for the time period relevant to this case. These records
26  fully support all claimed costs. The primary issue in this case, is thus whether or not such costs
27  are indeed "reimbursable" within the meaning of California Labor Code § 2802.

28        Respondents disagree that Claimant is entitled to reimbursement for any business-related
expenses. First, they argue that such claim is entirely barred by the Settlement Agreement,

1    which is discussed further below. Putting that aside, however, Respondents' position is that
2    Claimant was indeed reimbursed for such expenses through (a) "elevated commissions," (b)
3    Zep's Elite Rep Reimbursement Program, (c) Zep's technology allowances, and (d) "various
4    miscellaneous commission credits."

5         However, as to (a), the evidence and testimony admitted at trial unambiguously shows
6    that Respondents did not adopt an "elevated commissions" policy until July 2011. Turning to
7    (b), Zep's Elite Rep Reimbursement Program—which was also called AMT (presumably
8    referring to the tax term, Alternative Minimum Tax)—was essentially a tax-avoidance program
9    that permitted sales representatives to receive $500 per month of earned commissions "tax-free."
10   (Claimant's, Exh. 18 77:6-16 (Moffett Depo).) The program was not adopted until sometime in
11   2008. (H. Tr. 38:12-13.) Moffett testified that the purpose of the program was to acknowledge
12   certain "tax changes" that would allow representatives to "get some tax benefits" with respect to
13   "business-related expenses." (Id., 104:16-105:13.)

14        It was adduced at trial that, by (c) "technology allowances," Respondents are referring to
15   a $50 per month allowance that Zep did not initiate until sometime in 2008. (H. Tr. 47:4-14
16   (Grossman testimony).) This program marginally offset the thousands of dollars in business
17   expenses incurred by sales representatives by $50 per month. (Id.) Notably, however, Claimant
18   is *not* seeking reimbursement for any expenses incurred that were covered by the technology
19   allowance. Finally, with respect to Respondents' claim (d), that Claimant received "various
20   miscellaneous commission credits," testimony adduced at trial shows that this argument refers
21   merely to credits received by sales representatives to cover "occasional unusual expenses." An
22   example of such an expense might be if a representative sponsored a "trade show for the county
23   and [Zep] agreed to participate . . . ." (H. Tr. 44:17-22; 62:12-15). However, Zep's own
24   Director of Sales, Grossman, openly testified at trial that instances of such reimbursement were
25   "far and few between." (Id. 44:21-22.)

26        In sum, the evidence clearly shows that Respondents knew that Claimant was incurring
27   certain business-related expenses, that their unambiguous policy was not to reimburse such
28   expenses, and that they, in fact, did *not* reimburse those expenses.

     Respondents also take particular issue with Claimant's mileage reimbursement requests.

1    They argue that Claimant inflated her reported mileage, that Claimant's actual mileage costs

2    were substantially less than the IRS default rate, and that Claimant's requests for mileage

3    reimbursement should be discounted under the "Going and Coming" Rule.

4         B. *Commission Deductions*

5         In addition to business-related expenses, Claimant also alleges that she is entitled to

6    reimbursement of deductions taken from her commission payments for costs of promotional

7    items that she gave to current or prospective customers in order to induce sales. It is undisputed

8    that Respondents did indeed automatically deduct the costs of promotional materials—such as

9    ZEP credit cards, novelty items (such as screwdrivers, pens, caps, hats, golf balls bearing the Zep

10   logo), samples, and literature—from sales representatives' commissions. (*See* Claimant's, Exh.

11   15; H. Tr. 109:22-110:19.) Samples included items that Claimant used to demonstrate new

12   products to customers and then left with customers to try. (H. Tr. 104:14-24.) Similarly,

13   Respondents deducted the costs of "gifts"—like Zep calendars—that Claimant sent to customers

14   around the holidays. (*Id.* 106:10-19.) Shipping costs—including initial freight costs as well as

15   costs incurred on customer returns—were also deducted from Claimant's commissions. (*Id.*,

16   Exhs. 15 (Summary of Activity Code Adjustments), 19 (Henson Depo., 89:6-11); H. Tr. 112:14-

17   17.) Additionally, Zep deducted the costs of equipment—such a soap dispensers—that Claimant

18   installed at customers' facilities. (H. Tr. 112:18-25.) Claimant further testified that, until

19   recently, she had been unaware that certain costs—such as for Zep literature and credit cards—

20   were being deducted from her commissions. (*Id.* 111:4-20.) And at least for some period of

21   time, Zep also deducted $10 from sales representatives' commissions each time a representative

22   placed an order via phone (rather than online). (*Id.* 47:15-25; *see also* Claim., Exh. 7.)

23        Evidence adduced at trial also reveals the manner in which such deductions were applied.

24   Namely, Respondents would calculate sales representatives' commissions in accordance with the

25   formula set forth in the paragraph 2(a) of the Employment Contract, which provides that Zep

26   "will pay the Salesman a commission of 50% of the profit on the sales made by the Salesman

27   after deducting the cost of the merchandise sold plus a sum equal to 10% of the sales price for

28   overhead expenses. The cost of merchandise shall be fixed and determined by the Company in

     accordance with merchandise market conditions." (Resp., Exh. 202 (Employment Contract);

1    Claimant's, Exhs. 1, (same); 23 (Deposition of John Ward, ZEP's director of revenue

2    management and person most knowledgeable, 18:11-14.) This formula was also subject to

3    several qualifications: first, that "[t]he Salesman shall NOT be entitled to any commission on

4    sales made by him . . . until and unless the customer or customers to whom such sales were made

5    has paid for in full to the Company the amount of such sale or sales," (Claim., Exh. 1, ¶ 4) and,

6    second, that "[t]he Salesman shall pay Fifty (50%) percent of the cost of all souvenirs and/or

7    advertising matter distributed by him" and, "[i]n the event a sale is made F.O.B. destination, 50%

8    of the shipping charges thereon shall be deducted from the commission due the Salesman." (*Id.*

9    ¶¶ 7, 8.) Third, the Employment Contract provided that "[i]f any merchandise is returned

10    through no fault of the Company, or should any account be considered by the Company to be

11    worthless or uncollectible, the Salesman agrees to repay to the Company the amount of money

12    he received as commission for such sale or sales together with any expense incurred by the

13    Company in attempting to make collection, or in recovering the merchandise." (*Id.* ¶ 10.)

14       Claimants argument appears to be premised on the assumption that deductions for

15    promotional items were then taken *after* the total commissions earned were calculated under the

16    formula set forth in ¶ 2(a). Claimant argues that the formula set forth in ¶ 2(a) does not mention

17    any deductions, the "profit" to which ¶ 2(a) refers means "gross" profits—not "net" profit after

18    deductions. Under the assumption that Claimant has therefore "earned" a commission in the

19    amount of gross—not net—profits, the "subsequent" deductions allegedly violate California

20    Labor Code § 221. Claimant argues that she is therefore entitled to $163,837.64 in principal

21    deductions in an additional $76,132.31 (as of February 27, 2014) in interest accrued on amounts

22    of commission allegedly earned but wrongfully withheld. (*See* Claim., Exh. 15.) Respondent

23    contends that its "net profit commission plan" is entirely consistent with § 221 because

24    deductions are entirely discretionary and directly tied to Claimant's sales and because Claimant

25    agreed to such deductions by contract.

26       C. *The Britto Action & The Settlement Agreement*

27       On December 30, 2010, former Zep employees Keith Britto and Justin Cowen filed the

28    *Britto v. Zep* putative class action previously referenced, alleging that Zep had violated

   California law by, *inter alia*, (1) failing to separately reimburse representatives for work-related

expenses and (2) improperly deducting certain expenses from representatives' wages. (RJN, Exh. 1.)

From April through July 2011, Zep took a number of actions related to the *Britto v. Zep* case. First, on April 7, 2011, Zep issued a Company Position Statement to all of its California sales representatives in which Zep described its position on the *Britto v. Zep* case. (Claimant's, Exh. 3.) Second, Zep held five "town hall meetings" on April 19, 20, and 21, respectively—one of which Claimant attended—in which Zep executives apprised employees of the *Britto* litigation "from Zep's perspective." (H. Tr. 114:2-115:14; Resp., Exh. 226 (invitation to town hall meetings).)

At trial, Claimant testified as to her perception of one such meeting as follows: "[W]e were all sitting at different tables, and [CEO John Morgan was] walking around and speaking very aggressively, and then he start[ed] hitting his hand like this, [and] said: 'I'm going to fight with tooth and nail, this lawsuit.'" (*Id.* 115:7-11.) Claimant further testified that she was perturbed (to say the least) by Mr. Morgan's conduct at the town hall meetings: "[This speech] stuck in my head, *I was just petrified*, I couldn't believe he's our CEO and he's *threatening us* and what he was doing, you know, his action was not very professional . . . ." (*Id.* 115:11-14 (emphasis added).)

Third, Respondents rolled out a new compensation and reimbursement policy, which "supersede[d] any and all commission-only programs" and became effective July 1, 2011. (Claimants' Exhs. 4, 6.) As previously described herein, this new policy set forth a comprehensive regime under which 10% of commissions are apportioned to reimbursement of business-related expenses. (*Id.*, Exh. 6.)

Fourth, Zep mailed settlement offers and releases to numerous *Britto v. Zep* putative class members, including Claimant. (*Id.* 115:15-17.) Claimant received such a letter, dated May 24, 2011, in which Respondent Zep offered her $27,000 to settle any potential claims she might have related to the *Britto v. Zep* action (the "Settlement Letter"). (*See* Resp., Exh. 205.) Attached to the letter was a Settlement and Release Agreement ("Settlement Agreement"). (*Id.*) In many ways, the Settlement Letter mirrored the aggressive stance taken by Mr. Morgan at the "town hall" meetings. For example, it made clear that Zep's intention was to "mount an aggressive

1  defense and to prepare for a long and difficult battle" against the *Britto v. Zep* suit. (*Id.* ¶ 1.)

2  The Letter further stated that "litigation is an adversarial process" in which "[Claimant's]

3  interests and the Company's interests are adverse with regard to the claims in the lawsuit." (*Id.* §

4  2, ¶ 3.)

5      On the other hand, the Letter also contained several statements purporting to assuage any

6  concerns of retaliation against those employees that declined the settlement offer: (1) "Whether

7  or not you choose to accept this offer will have no impact whatsoever on your future

8  employment with the Company"; (2) "While the Company hopes you accept this offer, this

9  decision is entirely yours to make"; (3) "I want to assure you that we will not tolerate any

10  retaliation against any employee as a result of not accepting this offer or participating in this

11  lawsuit"; and (4) "Absolutely no adverse actions will be taken against you no matter what you

12  decide to do." (*Id.* §§ 3-4, 6.) The Letter also invited Ms. Unrine to "contact" Respondents'

13  attorneys or to "consult with Alejandro P Gutierrez and/or Daniel J. Palay, the attorneys

14  representing Britto and Cowan and who are seeking to represent the putative class." (*Id.* § 5.)

15      Under a paragraph entitled "Release," the Settlement Agreement states, in relevant part:

16  "Sales Representative . . . does hereby release, acquit and agree to a complete settlement of any

17  and all claims . . . known or unknown . . . that Sales Representative may have against the

18  Company . . . arising out of or in any manner related to the Ongoing Litigation [defined as the

19  First Amended Complaint in the *Britto v. Zep* action] . . . ." (Resp., Exh. 206 (executed

20  Settlement and Release Agreement), ¶ H.)

21      At some point during all this tumult, Zep's CEO John Morgan called Claimant

22  personally. (Claimant's Exh. 27 (Morgan Depo. 17:4-7).) This was the same CEO that Claimant

23  witnessed thumping on tables and taking a hardline at the town hall meetings. It is also notable

24  that Zep is an international company that employs 630,000 employees worldwide and

25  approximately 2,900 employees in California alone. (*see id.* 183:18-19). Moreover, Claimant

26  was 72 years old at this time and the sole breadwinner for her family. She earned between

27  $100,000 and $115,000 per year. (H. Tr. 159:4-18.) Claimant was thus reasonably surprised and

28  intimidated to hear personally from the company's CEO. Claimant had no personal relationship

with Morgan. She had met him only "once or twice" before—at the town hall meeting

1  previously described and possibly at another meeting before that. In any event, any prior
2  "meetings" had been in a group setting—never one-on-one. (H. Tr. 116:7-117:14.)
3  Furthermore, Claimant had never before received a phone call from Morgan. (*Id.* 117:15-17.)

4        The exact date of contact is disputed—Morgan testified that the call occurred around
5  April 7th or 8th (*see id.* 173:22-174:1 (Morgan testimony)), whereas Claimant suggests it took
6  place after she received the settlement offer in May. (*See id.* 117:23-25.) In any event, it clearly
7  took place after the commencement of the *Britto* action. At trial, Claimant testified that Morgan
8  called her to "tell me that this letter that was sent to me, I need to sign it and get it back . . . ,"
9  (*Id.* 117:23-25.) Although she understandably had trouble recalling precisely what was said,
10 Claimant further testified:

11        I just remember him really pressuring me and I was intimidated, I was worried
12        about losing my job, being fired, because I'm a sole supporter, and at this stage of
13        my life I didn't want to take a chance of really, you know, worrying about where
14        do I go find a job now . . . . But his pressure, I felt I had my back against the wall
15        with him: You know, you have to sign this letter, da, da, da, and we're going to
16        win this case. (*Id.* 118:1-10.)

17        Morgan also contacted about a dozen other sales representatives. (Claim., Exh. 27
18 (Morgan Depo. 17:14-15).) Claimant's testimony as to the tone, content, and purpose of the
19 phone call (to intimidate and deter California Sales Representatives from pursuing rights though
20 the *Britto* action) is corroborated by testimony at the Hearing from another sales representative,
21 Lynn Woodford. Woodford testified that Morgan had been very "agitated" when he called her
22 and that he threatened that, if she joined the *Britto* lawsuit, her "taxes would be open to
23 scrutiny," her sales commissions percentage would drop by ten percent, she would be subjected
24 to "tough" depositions, and would be considered an "adversary" of the company. (H. Tr.
25 184:15-16; 186:1-187:14.) She further testified that the clear purpose of the call was to convince
26 her to "opt out" of the *Britto* lawsuit. (*Id.* 187:11-14.) Although this testimony does not
27 conclusively prove the content of Morgan's phone call to Claimant, it does substantially impeach
28 Morgan's own testimony. This, in turn, supports Claimant's general contention that the purpose
   and effect of these phone calls was to intimidate or strongly discourage California sales

representatives from participating in the *Britto* suit—whether by causing them to "opt out" and/or by coercing them to sign the Settlement Agreement.

Additionally, Claimant presented evidence that, in June 2011, Zep's President of North America Sales and Service, Tom Moffett, also made calls to various sales representatives who had not yet signed the Settlement Agreement. Indeed, Moffett himself admitted that he spoke to Claimant twice at the end of June 2011—right around the time when Claimant apparently had a change of heart about signing the Settlement Agreement. (Claim., Exh. 18 (Moffett Depo, 170:7-8; 171:16-172:8).) Moffett testified regarding those conversations as follows: "I gave her [Unrine] a call because I had seen that she had not gotten in one of the [settlement and release] forms, so I just called her to see if she could—if she had any questions . . . ." (*Id.*) In other words, upon learning that Claimant had not responded to Zep's Settlement Letter, Moffett called her specifically to pressure her into executing the Settlement Agreement.

Moreover, the timing of Claimant's signing of the Settlement Agreement corroborates her version of events. The Settlement Letter, dated May 24, 2011, requested that Claimant "respond to this offer by June 24, 2011." (Resp., Exh. 205, § 6).) However, Claimant did *not* respond to the Settlement Agreement within this one-month timeframe. (*Cf. id.*, Exh. 206 (executed Settlement Agreement dated June 28, 2011).) This fact corroborates her testimony that she had no intention of signing the Agreement. (H. Tr. 116:2-5.) Yet Claimant did ultimately sign the Agreement—shortly after the deadline had passed—on June 28, 2011. (Resp., Exh. 206.) This timing is consistent with her testimony that she received a phone call from a senior Zep executive—whether Morgan or Moffett or both—after she failed to execute the Settlement Agreement by the June 24th deadline, and that such call convinced her that she had no real choice but to promptly sign the Agreement.

In short, the Arbitrator finds that Claimant signed the Settlement Agreement only because she felt substantial pressure from Zep to do so. Under the circumstances detailed above, Claimant rationally believed that her job was at stake if she did not sign the Agreement. And in light of her circumstances (being the sole bread winner at the age of 72), losing her job was simply not a risk she could afford to take. Confronted with such a Hobson's choice, Claimant signed the Settlement Agreement.

1    Sometime in the next few months, Claimant consulted with the *Britto* plaintiffs' counsel.

2  In so doing, she determined that she had actually incurred reimbursable expenses and suffered

3  allegedly unlawful deductions far in excess of the $27,000 settlement that she had received.

4    Thus, on November 22, 2011, Ms. Unrine sent a letter to Mr. Morgan purporting to

5  retract her release of claims under the Settlement Agreement ("November 22nd Letter"). (Resp.,

6  Exh. 207 (Letter from Unrine to Morgan).) In that Letter, Ms. Unrine stated her belief that the

7  Settlement Agreement was "null and void" under California Labor Code section 2802 and that

8  her signature had been obtained through misinformation issued by Zep as she had not realized at

9  the time she signed the Letter that she had any legal rights against Zep. (*Id.*) She therefore

10  purported to "officially retract the waiver that [she] signed." (*Id.*)

11    Zep responded in a letter dated December 5, 2011 in which it refused to accept

12  Claimant's revocation and repeated its position that the Settlement Agreement constitutes a valid

13  and binding release of all claims. (*Id.*, Exh. 208.)

14    At trial, Claimant raised a number of theories as to why the Settlement Agreement is

15  invalid: (1) that it is void as a matter of law under California Labor Code § 2804, which provides

16  that any contract or agreement in which an employee waives her right to reimbursement of

17  expenses is null and void, unless legitimately disputed; (2) that the Settlement Agreement is

18  unconscionable and therefore void; and (3) that Zep obtained her signature through coercion,

19  which renders the Agreement unenforceable.

20                          VI. ANALYSIS OF CLAIMS

21  A. *Request for Judicial Notice*

22    On February 26, 2014, Claimant filed a request for judicial notice of 19 documents

23  comprised of court records in the underlying *Britto v. Zep* and *Aguilar v. Zep* actions, as well as

24  arbitration decisions in related cases arising out of the *Aguilar v. Zep* suit. California Evidence

25  Code permits a court to take judicial notice of court records. *See* Cal. Evid. Code § 452(d).

26  Courts may also take judicial notice of arbitration proceedings at their discretion. *See, e.g.,*

27  *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994).

28    In light of these principles, the Arbitrator hereby grants Claimant's Request for Judicial

Notice to the extent that such documents prove useful to the just and efficient disposition of this

1  case. Nonetheless, particularly with respect to the arbitration awards in related cases, the

2  Arbitrator neither defers, nor gives any weight, to such decisions. *See Stacks*, 27 F.3d at 1326

3  n.3 ("Although we take notice of the decision, we do not defer to it, nor give it any weight.")

4  B. *Enforceability of the Settlement Agreement: Contracts Rendered Under Threat of*

5  *Duress or Undue Influence Are Unenforceable*

6  Whether the Settlement Agreement is enforceable presents a threshold issue. If the

7  Settlement Agreement is indeed enforceable, Claimant's claims are barred. For the reasons set

8  forth below, however, the Arbitrator finds that Respondents secured Claimant's signature

9  through coercion—specifically economic duress and undue influence.

10  A contract is enforceable against a party only if consent is freely given, mutual, and

11  communicated by that party to another. Cal. Civ. Code § 1565. However, a party may rescind a

12  contract or settlement agreement if his or her consent thereto was "obtained through duress,

13  menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom

14  he rescinds." Cal. Civ. Code § 1689; *see also Philippine Exp. & Foreign Loan Guarantee Corp.*

15  *v. Chuidian*, 218 Cal. App. 3d 1058, 1077 (1990); *cf. Lanigan v. City of Los Angeles*, 199 Cal.

16  App. 4th 1020, 1034 (2011). In other words, consent obtained through duress or undue influence

17  is not "freely given" within the meaning of § 1565.

18  1. Duress

19  Courts have taken an increasingly expansive view of the types of conduct that rise to the

20  level of duress and thereby form the basis for a claim of rescission. Though at common law

21  courts recognized only "threats of physical violence and later included wrongful seizure or

22  detention of goods[,] [m]odern decisions have recognized as improper a much broader range of

23  threats, notably those to cause *economic harm.* Restatement (Second) of Contracts § 176 (1981)

24  (emphasis added). Indeed, the California Supreme Court has recognized the doctrine of

25  economic duress in private sector cases since at least 1931, *see Young v. Hoagland*, 212 Cal.

26  426, 430–432 (1931), and California courts have consistently recognized the doctrine ever since.

27  *See, e.g., Lanigan v. City of Los Angeles*, 199 Cal. App. 4th 1020, 1034 (2011) ("The doctrine of

28  economic duress can form a basis for rescission of a settlement agreement."); *Chuidian*, 218 Cal.

App. 3d 1058, 1077 (1990) ("The Restatement of Contracts defines such threats very broadly

1  under the heading of economic compulsion. Impermissible threats include bad faith threatened
2  use of civil process; threats which are a breach of the duty of good faith and fair dealing under a
3  contract with the recipient; threats which would harm the recipient without significantly
4  benefitting the party making the threat; or threats where 'what is threatened is otherwise a use of
5  power for illegitimate ends.'" (citing Restatement (Second of Contracts § 176 (1981))); *Rich &*
6  *Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (1984).

7  The touchstone of duress is thus that the party claiming it believed he or she had "no
8  'reasonable alternative'" other than agreeing to the contract the party now "seeks to avoid,"
9  *Lanigan*, 199 Cal. App. 4th at 1034. Nonetheless, a showing of economic duress does *not*
10 require a showing that the other party's coercive conduct rose to the level of a crime or tort. *See*
11 *Chuidian*, 218 Cal. App. 3d at 1077-79 (analogizing economic duress to the crime of blackmail,
12 which often entails the threat of *lawful* action and becomes unlawful only because such threat is
13 coupled with a demand for money); *Rich & Whillock, Inc.*, 157 Cal. App. 3d at 1158. Rather,
14 what matters is that the "wrongful act . . . is sufficiently coercive" such that "a reasonably
15 prudent person" would find themselves "faced with no reasonable alternative [but] to succumb to
16 the perpetrator's pressure." *Chuidian*, 218 Cal. App. 3d at 1077. The express or implied threat
17 therefore need not be illegal, it must simply be sufficiently coercive so as to render a settlement
18 agreement unenforceable for lack of voluntary consent.

19 In *Rich & Whillock, Inc.*, for example, the court granted rescission of a settlement
20 agreement that the defendants had obtained through failing—in bad faith—to pay amounts owed
21 to the plaintiff. 157 Cal. App. 3d at 1160-61. The failure to pay essentially drove the plaintiff to
22 the brink of bankruptcy. *Id.* at 1160. In order to avoid bankruptcy, the plaintiff accepted a
23 settlement of far less than the actual amount due; the plaintiff then turned around and sued the
24 defendants to recover the remainder of the amount owed. *Id.* at 1160-61. The court found such
25 coercive tactics rose to the level of economic duress and rescinded the settlement agreement. *Id.*
26 at 1161.

27 Notably, when applied to individuals, the existence of economic duress is determined
28 "not by the objective nature of the threats, but by *the state of mind induced thereby in the*
*victim.*" *Chuidian*, 218 Cal. App. 3d at 1078 (internal quotations omitted) (emphasis in original)

1  (quoting *Balling v. Finch*, 203 Cal. App. 2d 413, 419 (1962)). And this subjective test is

2  consistent with § 1565, which necessarily implies such subjectivity in requiring that consent be

3  "freely" given. An inquiry into the existence of duress is therefore often highly fact-specific. In

4  addition to the circumstances surrounding the act of contracting itself, relevant factors therefore

5  include "the age, sex, state of health, and mental characteristics of the alleged injured party . . . ."

6  *Id.* (italics omitted).

7        Finally, the competing policy concerns safeguarded by the economic duress doctrine

8  guide the Arbitrator's decision in the present case: "On the one hand, courts are reluctant to set

9  aside agreements because of the notion of freedom of contract and because of the desirability of

10  having private dispute resolutions be final. On the other hand, there is an increasing recognition

11  of the law's role in *correcting inequitable or unequal exchanges between parties of*

12  *disproportionate bargaining power. Rich & Whillock, Inc.*, 157 Cal. App. 3d at 1158 (emphasis

13  added). The latter concern has led to "a greater willingness to not enforce agreements which

14  were entered into under coercive circumstances." *Id.*

15        Applying these principles, the Arbitrator finds that Claimant is entitled to rescission

16  because Respondents coerced her execution of the Settlement Agreement through economic

17  duress. At the time of settlement, Claimant was 72 years old, and her salary provided the sole

18  support for her family. She had been with Zep for over 30 years—since 1980. During the

19  relevant time period, her salary was around $100,000 per year. Particularly in light of the

20  economic conditions in 2011, it would have been very difficult for Claimant, as a 72-year-old, to

21  find employment had Zep terminated her. And even assuming that she might have been able to

22  secure alternative employment, it certainly would *not* have been on terms comparable to those

23  she enjoyed at Zep. Claimant was a saleswoman and had spent 30 years at Zep building her

24  clientele. She was paid solely on commission. Even assuming that another employer would have

25  hired a 72-year-old saleswoman, Claimant would have had to largely start over. She would have

26  almost certainly lost months or years of pay in the short-term and had to accept a job paying only

27  a fraction of what she had been earning in the long-run.

28        Under the totality of these circumstances, losing her job would have worked such a

substantial hardship upon Claimant that a reasonably prudent person in her position would have

1  avoided any action that carried the substantial risk of being terminated by Zep. Under these
2  unique circumstances, the economic hardship Plaintiff would have faced had she lost her job was
3  reasonably equivalent to the economic hardship faced by the plaintiffs in *Rich & Whillock*.

4      The next question is therefore whether Claimant reasonably believed that failing to
5  execute the Settlement Agreement carried a significant enough risk of termination such that she
6  had no choice but to sign it. Respondents, and particularly Morgan, contend that Zep did not at
7  any point threaten Claimant, and that any perception to the contrary is therefore either irrational
8  or fabricated. Nevertheless, the Arbitrator concludes that Claimant did subjectively believe that,
9  if she did not sign the Agreement, she would likely lose her job. Moreover, the Arbitrator
10  concludes that this belief was reasonable and was induced by Zep executives Morgan and
11  Moffett.

12      The evidence clearly shows that—out of 630,000 employees worldwide and 2,900 in
13  California alone—Morgan selected only a handful to call personally. The Arbitrator finds that
14  the purpose of such call was not merely to "inform" Claimant about the *Britto* lawsuit—as
15  Morgan and Moffett claim. If that were Zep's true purpose, the company could have done that
16  equally, if not more effectively, through the town hall meetings and through written materials
17  (such as the company's April 2011 Position Statement). Moreover, the company could have had
18  directed supervisors make themselves available to employees to answer any questions that might
19  arise.

20      Rather, the very fact that Zep chose to have its CEO make targeted phone calls to a few
21  select lower-level employees shows that the purpose of these calls was intimidation. The
22  company perceived certain employees as high risk and sought to neutralize that risk by
23  leveraging the huge power inequity between Morgan (as CEO) and various sales representatives.
24  And as both Claimant's and Woodford's testimony shows, this purpose came through loud and
25  clear. Indeed, both Claimant and Woodford testified that they were intimidated by the phone
26  calls. Throughout her testimony, Claimant reiterated that she felt substantial "pressure." Though
27  Woodford testified that Morgan threatened her in a more overt fashion, both received the same
28  message—they would suffer adverse consequences if they took a position adverse to the
company's in the *Britto* action. And the fact that Morgan may not have directly told Claimant

1   that she would be terminated if she "opted out" does not necessarily show that a threat was not

2   made. Indeed, everyone knows that threats can be implicit—conveyed through inflection, tone

3   of voice, and insinuation—as well as explicit. And both Morgan and Claimant were aware that

4   Morgan had the power and authority to terminate Claimant if he so chose.

5       Moreover, Morgan's phone call must be viewed in light of surrounding circumstances.

6   Both the April Position Statement and the Settlement Letter made statements insinuating that

7   Zep would not be pleased with employees who opted to pursue rights raised in the *Britto v. Zep*

8   action. Moreover, in the town hall meetings, Morgan spoke and acted very aggressively. He

9   made it very clear that he planned to fight the *Britto* action "tooth and nail." He thumped on

10   tables for emphasis. Claimant testified that she found Morgan's behavior to be unprofessional,

11   that she was "petrified," and that she was shocked that the company's CEO was actually

12   threatening them. The evidence adduced at trial therefore supports Claimant's conclusion that

13   the purpose of the meetings was not to objectively apprise employees of the *Britto* action, but to

14   discourage employees from pursuing claims raised in that action. And the fact that Zep's

15   official, "form" statements contained assurances that employees would not suffer "adverse

16   action" if they joined the *Britto* action are not determinative when the company's actual conduct

17   suggests the opposite.

18       And any shred of security that Claimant might have retained throughout these events was

19   eviscerated when Claimant received a call from yet *another* Zep executive—Tom Moffett—

20   asking her why she had not signed and returned the Settlement Agreement. And the fact that a

21   busy executive of a huge company was taking the time to call Claimant personally affirmed her

22   perception that she was a potential target. This call was thus an attempt to exert pressure on

23   Claimant to sign the Settlement and Release when she failed to do so by the company's deadline.

24   Moreover, the clear import of the call was that Claimant's failure to cooperate would result in the

25   company's interests being adverse to Claimant's interest. And employees whose interests

26   become adverse to their employers generally do not remain employed for long.

27       In sum, both Morgan and Moffett used the extreme power inequities between themselves

28   and Claimant to strongly suggest that (a) Claimant should opt out of the class action, and (b)

    Claimant to execute the Settlement Agreement. Because Claimant reasonably believed that the

1  consequences of not executing the Settlement Agreement were that she would not be able to
2  continue to financially support herself and her family, Claimant (as any reasonable person in her
3  circumstances would) believed that she had "no reasonable alternative" other than to execute the
4  Settlement Agreement. The Settlement Agreement is therefore unenforceable because
5  Claimant's consent was obtained through economic duress.

6       Finally, the public policy underlying the rule that settlement agreements must be set aside
7  in the face of duress supports this conclusion. As courts have noted, "there is an increasing
8  recognition of the law's role in correcting inequitable or unequal exchanges." This was clearly an
9  inequitable exchange. Although Respondents argue that Claimant was free to contact Britto's
10  attorneys, Claimant did *not* have a *true* opportunity to pursue this option, because Respondents
11  expected her to execute the Settlement Agreement in a timeframe that would not have allowed
12  her to pursue other options. Claimant tried to resist signing the Agreement and was quickly met
13  with substantial pressure by Zep executives that caused her to fear for her job. Indeed, because
14  of Claimant's circumstances, Respondents' implicit threat to take unlawful action (retaliatory
15  termination) effectively left her with only one option—execute a fundamentally unfair
16  agreement.

17      2. Undue Influence

18       Additionally, or alternatively, these same facts support a finding of undue influence,
19  which offers an independent ground under California Evidence § 1565 upon which a contract
20  may be found unenforceable and a plaintiff entitled to rescission. Undue influence is simply the
21  "use of excessive pressure by a dominant person over a servient person resulting in the apparent
22  will of the servient person being in fact the will of the dominant person." *In re Cheryl E.*, 161
23  Cal. App. 3d 587, 601 (1984); *Keithley v. Civil Serv. Bd.*, 11 Cal. App. 3d 443, 451 (1970). This
24  section therefore incorporates all arguments made in the prior section regarding the extreme
25  power inequity between Claimant and Zep executives Morgan and Moffett, which Respondents
26  used to pressure Claimant into signing the Settlement Agreement.

27       Under California law, undue influence exists when (1) "one . . . who holds a real or
28  apparent authority over [another], [uses] such . . . authority for the purpose of obtaining an unfair
    advantage over [another]," (2) one "tak[es] an unfair advantage of another's weakness of mind,"

or (3) one "tak[es] a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575. Though only one of these must be satisfied, Claimant's evidence establishes both (1) and (3).

The touchstone of undue influence is coercion—it "is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 130 (1966). "The hallmark of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion. In this sense, undue influence has been called overpersuasion." *Id.* (citing *Kelly v. McCarthy*, 6 Cal. 2d 347, 364 (1936)). As the court in *Odorizzi* explained, undue influence occurs when superiors "undert[ake] to achieve . . . to secure [a subordinate's] signature *but not his consent* . . . through a high-pressure carrot-and-stick technique—under which they assured plaintiff they were trying to assist him, he should rely on their advice, there wasn't time to consult an attorney, if he didn't [sign] at once [he would be fired and publicly humiliated] . . . ." *Id.* at 135 (emphasis added).

By its very nature, however, direct evidence of undue influence is "rarely obtainable," and "thus the court is normally relegated to determination by inference from the totality of facts and circumstances." *Keithley*, 11 Cal. App. 3d at 451; *Beckmann v. Beckmann*, 174 Cal. App. 2d 717, 721 (1959); *Wells Fargo Bank & Union Trust Co. v. Brady*, 116 Cal. App. 2d 381, 399 (1953).

For the reasons already in Part VI(B)(1) above, Zep—through Moffett and Morgan— used its substantial authority and leverage to obtain an unfair advantage over Claimant. And they did so by taking advantage of Claimant's financial vulnerability. Although all employers exert some degree of authority over an employee, the power inequity between Claimant (who was but one of 630,000 employees) and Morgan (Zep's CEO), was extreme. And Respondents used this to their advantage. The Morgan and Moffett phone calls were strategically timed to sow fear and apprehension in order to coerce Claimant into opting out of the class action (had it been certified) and, subsequently, into executing the Settlement Agreement. And, although Zep purported to be "helping" Claimant decide what course of action to take, the conduct of Respondents' executives consistently suggested that participating in the *Britto* action was not

really an option. Thus, like in *Odorizzi*, Morgan and Moffett sought "to secure [Claimant's] signature but not [her] consent." Respondents' intimidation rises to the level of undue influence within the meaning of § 1575(1).

Moreover, Respondents were obviously aware of Claimant's age and the corresponding implications of that fact. They were aware that, unlike a younger employee, Claimant would be unable to "work her way back up" at a new company. They were also aware that she was far less marketable than a younger employee. Indeed, the evidence even suggests that Morgan systematically targeted more seasoned sales representatives who had been with the company for substantial periods of time (Woodford had also been with Zep for over 20 years, *see H. Tr.* 184:17-18) and who might therefore be most susceptible to intimidation. This reality—coupled with the fact that Claimant is the sole supporter of her family—meant that maintaining her job with Zep was a financial necessity. By forcing her to essentially choose between foregoing a necessity and executing the Settlement Agreement, Respondents took "unfair advantage" of Claimant's financial situation within the meaning of § 1575(3).

In short, the Settlement Agreement is unenforceable on two independent grounds because Claimant's consent was obtained through both economic duress and undue influence.

3. Unconscionability & Labor Code § 2804 Violation

Because the Arbitrator has found the Settlement Agreement unenforceable on the grounds of undue influence and economic duress, it is unnecessary to consider Claimant's alternative theories that the Agreement is unconscionable or that it violates California Labor Code § 2804. *See* Cal. Lab. Code § 2804 ("Any contract or agreement, express or implied, made by any employee to waive the benefits of this article [2800 et seq.] or any part thereof, is null and void . . . ."). Nonetheless, it is unlikely that the evidence adduced at trial would be sufficient to establish either of these theories.

C. *Reimbursement of Business-Related Expenses*

1. The Statutory Requirement of California Labor Code § 2802

Under California law, an employer must reimburse an employee for business-related expenses that are "necessary" to the employee's completion of his or her employment obligations. Cal. Lab. Code § 2802 ("An employer shall indemnify his or her employee for all

1 | necessary expenditures or losses incurred by the employee in direct consequence of the discharge
2 | of his or her duties, or of his or her obedience to the directions of the employer . . . .").

3 | "[D]esigned to prevent employers from passing their operating expenses on to their employees,"
4 | § 2802 serves California's longstanding public policy of protecting employees from being taken
5 | advantage of by employers. *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 562 (2007).
6 | Moreover, "Section 2802 is subject to [the] anti-waiver provision" in California Labor Code §
7 | 2804. *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 902 (N.D. Cal. 2009).

8 | In order for § 2802 to apply, however, an employee must show that (a) expense was
9 | "necessary" and (b) that the employer indeed failed to reimburse the employee. Notably, the
10 | standard of "[n]ecessity is by nature a question of fact." *Grissom v. Vons Companies, Inc.*, 1 Cal.
11 | App. 4th 52, 58 (1991). An expense is "necessary" if the court determines that it "was
12 | reasonable under the circumstances." *Id.*

13 | Claimant urges that Respondents violated § 2802 by failing to reimburse her for the
14 | following categories of expenses: (1) mileage, (2) entertainment/meals, (3) cell phone, (4)
15 | business telephone, (5) postage, (6) internet, (7) computer and repair, (8) printer, (9) office
16 | supplies, (10) merchandise samples, (11) gifts to customers, (12) installation of Zep dispensers.

17 | 2. Claimant has Established That Respondents Have Not Reimbursed Claimant for Any
18 | Claimed Expenses.

19 | We dispose of the second prong—whether Respondents have indeed failed to reimburse
20 | Claimant for business-related expenses—first. Because the evidence clearly shows that, until
21 | July 2011, Respondents did not reimburse *any* of the claimed expenses, this element is
22 | established with respect to all (12) claimed categories. Nonetheless, Respondents claim that they
23 | have reimbursed Claimant through four mechanisms: (a) "elevated commissions," (b) Zep's Elite
24 | Rep Reimbursement Program, (c) Zep's technology allowances, and (d) "various miscellaneous
25 | commission credits." The Arbitrator considers and rejects each in turn.

26 | First, the record provides absolutely no support for (a). While it is true that Zep *could*
27 | *have* lawfully reimbursed Claimant through a "lump sum" payment scheme, such a scheme
28 | complies with § 2802 only if it *fully* reimburses an employee for all business-related expenses
incurred. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 570 (2007). Here, that is

clearly not the case because the evidence unambiguously shows that Zep's corporate policy
(until 2011) was *not* to reimburse outside sales representatives for business-related expenses.
First, the Employment Contract, which exclusively governed the Parties' relationship from the
period of 1980 through 2011, expressly provides: "The Salesman agrees that all expenses
incurred by him in connection with his employment, including but not limited to, expenses of
travel, entertainment, solicitation, and other sale expense shall be paid by him, and shall *not be
reimbursed by the Company*." (Claim., Exh. 1.) Second, Respondents never asked Claimant for
any documentation of evidencing her expenses. Moreover, they never issued any documentation
showing or even suggesting that some portion of Claimant's paychecks was allocable to business
expense reimbursement. Finally, the testimony of Zep employees—including management
personnel—overwhelmingly confirmed that sales representatives were *not* reimbursed for their
business expenses. In short, there was no "elevated commission" structure until July 2011.

Moreover, if the employer chooses to use a lump-sum payment scheme, "the employer
must provide some method or formula to identify the amount of the combined employee
compensation payment that is intended to provide expense reimbursement." *Id.* at 573. The
California Supreme Court found this requirement to be "implicit" in § 2802's statutory scheme,
because otherwise employees and officials would be unable to *enforce* the law, because they
would not be able to "differentiate between wages and expense reimbursements." *Id.* ("Because
providing an apportionment method is a practical necessity for effective enforcement of section
2802's reimbursement provisions, it is implicit in the statutory scheme."). Respondents have
entirely failed to comply with this requirement during the time period relevant to this case.

Respondents' next theory, (b) is that Zep's Elite Rep Reimbursement Program—which
was also called AMT (presumably referring to the tax term, Alternative Minimum Tax)—
reimbursed employees. The AMT program was essentially a tax-avoidance program that
permitted sales representatives to receive $500 per month of earned commissions "tax-free."
(Claimant's, Exh. 18 77:6-16 (Moffett Depo.)) The program was not adopted until sometime in
2008. (H. Tr. 38:12-13.) Specifically, Moffett testified that the purpose of the program was to
acknowledge certain "tax changes" that would allow representatives to "get some tax benefits"
with respect to "business-related expenses." (*Id.*, 104:16-105:13.) However, the fact that Zep

1  permitted its employees to take advantage of tax deductions to which they were legally entitled

2  has little bearing on the question of whether Zep properly reimbursed its employees for business-

3  related expenditures. Indeed, the very reason that employees were entitled to tax deductions was

4  because Respondent was unlawfully requiring them to pay out-of-pocket for reimbursable

5  business expenses.

6       Moreover, there is clearly a fundamental difference between permitting an employee to

7  take a tax deduction (which only *reduces* the effective cost of a business expense by reducing the

8  taxpayer's overall tax liability) and actually fully reimbursing such expenses. Thus, even

9  assuming the program somewhat alleviated employees' costs of bearing their own business-

10 related expenses, the Elite Rep Reimbursement Program fails to satisfy § 2802 for two reasons.

11 First it does not *fully* compensate employees for the actual costs of business expenses, as

12 required by *Gattuso*.[1] Second, Respondents still cannot point to any formula or method that

13 would allow employees to discern, prior to July 2011, the portion of pay allocable to expense

14 reimbursement and the portion allocable to actual wage payments. For all of these reasons, the

15 Arbitrator finds that this program did not reimburse Claimant's business-related expenses.

16      It was adduced at trial that, by (c) "technology allowances," Respondents are referring to

17 a $50 per month allowance that Zep did not initiate until sometime in 2008. (H. Tr. 47:4-14

18 (Grossman testimony).) This program marginally offset the thousands of dollars in business

19 expenses incurred by sales representatives by $50 per month. (*Id.*) Notably, however, Claimant

20 is *not* seeking reimbursement for any expenses incurred that were covered by the technology

21 allowance. Thus, the Arbitrator finds that this program did not reimburse Claimant for the

22 business-related expenses at issue in this case.

23      With respect to Respondents' claim (d), that Claimant received "various miscellaneous

24 commission credits," testimony adduced at trial shows that this argument refers merely to credits

25 received by sales representatives to cover "occasional unusual expenses," such as if a

26

27 [1] To illustrate, assume a taxpayer expends $20 in business expenses in order to earn $100. Further assume that the
applicable tax rate is 25%. By taking a tax deduction for the $20 business expense, the taxpayer reduces her taxable

28 income to $80, but her tax *liability* is only reduced by $5. ($80 * 25% = $20 and $100 * 25% = $25). Thus, the tax
deduction allows her to pay $20 in taxes instead of $25, but it does *not* compensate her for the *full* $20 business
expense.

**FINAL AWARD**
-26-

1   representative sponsored a "trade show for the county and [Zep] agreed to participate . . . ." (H.

2   Tr. 44:17-22; 62:12-15). However, Zep's own Director of Sales, Grossman, openly testified at

3   trial that instances of such reimbursement were "far and few between." (*Id.* 44:21-22.)

   In sum, the evidence clearly shows that Respondents knew that Claimant was incurring

5   certain business-related expenses, that their unambiguous policy was *not* to reimburse such

6   expenses, and that they followed that policy.

7       3.   Mileage Costs Were Reasonably Necessary and Reimbursable

8       Claimant has convincingly shown that the mileage costs she claims were reasonably

9   necessary—and therefore reimbursable—under § 2802. Respondents required her to have and to

10  use her vehicle in the regular course of business to visit customers and procure sales of Zep

11  products. (H. Tr. 34:7-24 (testimony by Mark Grossman, current director of sales for Zep's

12  western region); 93:16-20 (testimony by Claimant).)

13      Respondents first seek to attack Claimant's entitlement by arguing that the odometer

14  readings reflected in Claimant's own records prove that she is in substantially inflating her

15  mileage claims. Respondents' argument is frivolous. The evidence clearly shows that Claimant

16  had two vehicles—both of which were Mercedes. Thus, while Claimant's records might seem to

17  support Respondents' conclusion upon first glance, any reasonably diligent review reveals that

18  any mileage discrepancies identified by Respondents were a result of the fact that Claimant had

19  two vehicles. Indeed, Claimant has kept impeccable records that clearly support the mileage

20  claimed in the present dispute. (*See* Claim., Exh. 12.)

21          a.  *The "Going and Coming Rule" Does Not Apply*

22      Second, Respondents urge that any mileage attributable to Claimant's commute between

23  her home office and first and last customer locations is disallowed under the "Going and Coming

24  Rule." Essentially, Zep urges that the travel to and from these locations is tantamount to an

25  employee driving to and from his primary place of employment.

26      The "Going and Coming" rule generally provides that an employee is generally

27  "considered [to be operating] outside the scope of employment" when "going to and from work."

28  *Huntsinger v. Glass Containers Corp.*, 22 Cal. App. 3d 803, 807 (1972); *see also Hinman v.*
   *Westinghouse Elec. Co.*, 2 Cal. 3d 956, 961 (1970). The application of this rule in the tort context

1  is well-established; that is, an employer is not liable for employee torts committed during the

2  employee's commute to his or her place of work. *Hinman,* 2 Cal. 3d at 961. Similarly,

3  Respondents argue, Zep is not liable for mileage reimbursement for commuting mileage that is

4  "considered [to be] outside the scope of employment."

5      Yet this ignores a clear exception to the Going and Coming rule. As the California

6  Supreme Court has recognized, the Going and Coming rule does *not* apply "where the trip

7  involves an incidental benefit to the employer, not common to commute trips by ordinary

8  members of the work force." *Id.* at 962. Thus, the application of the Rule turns on whether the

9  evidence shows that the employee's "duties for the day did not begin until he had reached the

10  office or place of business of his employer." *Richards v. Metro. Life Ins. Co.,* 19 Cal. 2d 236,

11  241 (1941).

12      For example, the California Supreme Court found that the Going and Coming rule did *not*

13  apply to trips by an *outside salesman* between his home office and client meetings at various

14  locations outside the office. *Id.* at 241-42; *see also Hinman,* 2 Cal. 3d at 961 (confirming the

15  *Richards* rule and holding). Indeed, the court found the rule inapplicable *even though* the

16  salesman was required to report to his employer's office building at some point during the day.

17  *Richards,* 19 Cal. 2d at 241. The court found it sufficient that the salesman was required to

18  complete both field and office work, and that he had flexibility in determining where to start his

19  day. *Id.* ("The present case, therefore, differs from those cases wherein the duties of the

20  employee were to be performed at a designated place or did not commence until he had arrived

21  at his employer's place of business."). Moreover, the same principle was applied in *Curphey v.*

22  *Comm'r of Internal Revenue,* which held that a petitioner's automobile expenses incurred in

23  traveling between his home office and various rental properties were "ordinary and necessary

24  expenses incurred in carrying on a trade or business" and *not* ordinary "commuting" expenses.

25  73 T.C. 766, 777-78 (1980).

26      The case cited by Respondents, *Lopez v. Pacific Bell Telephone Co.,* 2014 WL 784861

27  (Cal. Ct. App. Feb. 26, 2014), is inapposite. Not only is it unpublished and noncitable, but

28  Respondents' theory takes language and cases cited in *Lopez* out of context. Respondents urge

that employees are not entitled to reimbursement when they exercise a greater degree of

"control" over their mileage—i.e. they "decide when to leave, which route to take to work, and which mode of transportation to use." *Morillion v. Royal Packing Co.*, 22, Cal. 4th 575, 587 (2000). However, *Morillion*, which Respondents cite, merely held that when an employer *requires* its employees to report to a central location and to take a bus, from there, to a work site, the employer must compensate employees for the time spent riding the bus. *Id.* at 588. In contrast, when an employer merely asks an employee to report to the employee's principal place of business at a certain time—but does not specify *how* the employee is to get there—the time spent commuting is *not* compensable because this is simply an "ordinary" commute. Thus, *Morillion* merely holds that a normal commute between one's residence and one's principal place of work is not compensable—a principal clearly consistent with the Going and Coming Rule and with *Richards* and *Hinman*.

Respondents' theory is also flawed because it proves too much. Under the principle urged by Respondents, Claimant would be entitled to *no* mileage reimbursement at all, because, even though she was *required* to travel to locations in order to make sales, she had *discretion* in making her own schedule. Yet this would be clearly inconsistent with the principles repeatedly confirmed by the California Supreme Court.

Applying this framework, the Arbitrator concludes that the Going and Coming rule does *not* apply to bar any portion of Claimant's mileage reimbursement recovery. The evidence clearly shows that Claimant had a home office from which she made sales calls and entered online orders. Thus, unlike in the ordinary employer-employee relationship, Claimant's day often started at home. She was therefore acting *within* the scope of her employment when she left home to travel to various client locations. Moreover, unlike an employee's ordinary commute to the office—which does not benefit the employer—Claimant's commute to client locations *did* benefit her employer. Indeed, like in *Richards*, field work was an ordinary and necessary part of her employment, and Claimant had flexibility in determining when and where to start her day. Thus, the normal "Going and Coming Rule" does not apply.

b. *Claimant is Entitled to the IRS Deduction Rate*

Third, Respondents argue that the IRS deduction rate exceeds Claimant's actual mileage costs and that Respondents are required under California law to reimburse only actual mileage

1    costs. In support of its position, Respondents point to the testimony of Lee Czarapata, an expert
2    witness hired by Respondents. Czarapata testified that the IRS rate is meant to be a "tax
3    deduction safe harbor guideline and that's it"; he also testified that the IRS rate does not even
4    come close to approximating the actual costs of driving and maintaining a vehicle. (H. Tr.
5    196:12-23.)

6         For the following reasons, however, the Arbitrator finds that application of the IRS
7    mileage rate is indeed proper. To start, Czarapata's testimony is not credible and his suggestion
8    that it would be improper to use such rate is directly controverted by the California Supreme
9    Court in *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (2007). Moreover, California
10   Labor Code § 2802 provides that an employer must reimburse all "reasonable costs." Because
11   Claimant has shown that the mileage reimbursement she seeks under § 2802 is "reasonable," she
12   is entitled to reimbursement.

13        It is worth noting that Claimant's "actual" automobile expenses include a variety of costs,
14   including "fuel, maintenance, repairs, insurance, registration, and depreciation." *Gattuso*, 2 Cal.
15   4th at 568. Because of the complexity of calculating the actual costs of all of these expenses, the
16   IRS offers a flat deduction rate that approximates the total cost of all these expenses, but merely
17   requires the employee to keep track of actual miles driven. It is well-established that the IRS rate
18   is a "widely used and accepted" method of satisfying an employer's obligation under § 2802. *Id.*
19   at 569. Moreover, the Division of Labor Standards and Enforcement (DLSE) "has long
20   recognized the IRS rate for automobile reimbursement as a presumptively reasonable rate." *Id.*
21   at 564-65; *see also generally* 3 Witkin, Summary 10th Agency, § 122 (2005).

22        And while it is true that a mileage rate for automobile expense reimbursement "may be a
23   subject of negotiation and agreement between employer and employee," *Gattuso*, 42 Cal. 4th at
24   569, *no such negotiation occurred here.* Respondents policy of "no" reimbursement does not
25   count as a negotiation that could be said to supersede the default rule because that policy was
26   *unlawful.* Equity prevents Respondents from relying on an unlawful policy in order to reduce
27   their liability to Claimant arising out of that unlawful policy. In short, from 1980 until July
28   2011, Respondents did not provide any alternative automobile expense reimbursement rate that
     could be seen as superseding the default IRS rate. Thus, the IRS rate properly applies here.

**FINAL AWARD**
- 30 -

1    Moreover, even assuming that an employer could use the shield of the IRS mileage rate
2  (which was intended to protect employees against under-reimbursement) as a sword to reduce
3  the employer's liability, the employer *bears the burden* of showing that actual costs were less
4  than the IRS mileage rate. *Id.* at 565. Respondents have simply failed to carry that burden here.
5  And this conclusion is bolstered by the fact that, after the *Britto v. Zep* lawsuit was filed, Zep
6  adopted the IRS rate to reimburse its sales representatives. Thus, Zep itself has implicitly agreed
7  that the IRS rate is reasonable and that a lesser rate would not fully compensate employees. At
8  minimum, Zep's new policy shows that it is unwilling to run the risk that a lower rate would not
9  fully cover employees' actual costs.

10    In sum, the Arbitrator finds that the claimed IRS rate is a reasonable approximation of
11  Claimant's automobile expenses that she herself relied upon in reporting such expenses to the
12  IRS. It is enough that the reimbursement sought is a reasonable and was not superseded by a
13  contrary agreement between the parties. Claimant is entitled to all mileage expenses claimed.

14    4.  Claimant is Entitled to Cell Phone, Business Phone, and Internet Expenses

15    Respondent argues that Claimant "overreaches" by seeking cell phone and internet
16  expenses in excess of the amounts incurred by Claimant for business use. Notably, Respondents
17  do not dispute that they did, indeed, require Claimant to have incur cell phone and internet
18  expenses. Nor could they reasonably contest this fact because the evidence clearly shows that
19  Respondents required Claimant to make at least 20 calls a day to solicit sales of Zep products.
20  The evidence also shows that Respondents required Claimant to have internet access in order to
21  place orders for Zep products. In fact, they penalized Claimant $10 per order placed over the
22  phone rather than online.

23    In sum, Respondents correctly dispute only the amount of those claimed expenses.
24  Respondents are correct that § 2802 requires reimbursement of only those expenses that are
25  "necessary" and "reasonable." *See* Cal. Labor Code § 2802. To the extent Claimant relied on
26  her cell phone and internet for personal use, therefore, reimbursement for such expenses must be
27  disallowed.

28    Based on the testimony and evidence adduced at trial, the Arbitrator finds that 50% of
Claimant's cell phone and internet use was personal use. Such use was therefore not a

1  "necessary" business-related expense. Thus, Claimant is entitled to only 50% of the cell phone
2  and internet costs claimed. However, Claimant is entitled to 100% of the costs for the business
3  line that she was required to acquire and maintain in order to perform her employment
4  obligations for Zep. (See H. Tr. 102:7-13.) Such expense was "necessary" and "reasonable"
5  under § 2802 because Claimant used it only for business purposes. It is therefore fully
6  reimburseable.

7       5. All Other Claimed Expenses Are Not Reimbursable.

8       The Arbitrator hereby finds that all other claimed expenses—such as meals,
9  entertainment, gifts, office supplies, postage, etc.—were not "necessary" within the meaning of §
10  2802. For example, Claimant expressly testified that she was not required to take clients out to
11  lunch or to give them gifts around the holidays. And to the extent Claimant felt her customers
12  "expected" these benefits, that was a direct result of Claimant's own calculated decisions to
13  cultivate personal relationships and sales by making such expenditures. Thus, the incurrence of
14  such expenses was primarily discretionary on the part of Claimant and therefore beyond the
15  scope of § 2802.

16     D. **Deductions From Commissions**

17     "It shall be unlawful for any employer to collect or receive from an employee any part of
18  wages theretofore paid by said employer to said employee." Cal. Lab. Code § 221. For the
19  purposes of § 221, the term "wages" "includes all amounts for labor performed by employees of
20  every description, whether the amount is fixed or ascertained by the standard of time, task, piece,
21  commission basis, or other method of calculation." Id. § 200(a). Claimant urges that
22  Respondents violated § 221 by deducting from net commissions the costs of items such as
23  shipping, promotional materials, novelties, samples and demonstration products, and gifts.

24     "California courts have held that it is illegal under § 221 and other state statutes and
25  regulations for employers to take deductions for general business expenses from commissions
26  that are based on an individual employee's sales." Marr v. Bank of Am., NA, 506 F. App'x 661,
27  661 (9th Cir. 2013) (citing Kerr's Catering Serv. v. Dep't. of Indus. Relations, 57 Cal. 2d 319
28  (1962); Hudgins v. Neiman Marcus Grp., Inc., 34 Cal. App. 4th 1109 (1995); and Quillian v.
    Lion Oil Co., 96 Cal.App.3d 156 (1979)).

1  However, California courts have also recognized an exception to this rule, permitting
2  deductions "when (1) the deductions are tied to the employee's sales rather than general business
3  expenses, and (2) the employee agrees to the deductions by contract." *Id.* (citing *Koehl v. Verio,*
4  *Inc.*, 142 Cal.App.4th 1313 (2006); *Steinhebel v. L.A. Times Commc'ns., LLC*, 126 Cal.App.4th
5  696 (2005); and *Prudential Ins. Co. of Am. v. Fromberg*, 240 Cal.App.2d 185 (1966)). And
6  these cases show that the touchstone for whether a deduction is unlawful under § 221 turns on
7  whether the deductions are tied to an employee's specific sales (permissible) or whether the
8  deductions are merely a surreptitious means of the employer passing the costs of "general
9  business expenses" on to the employee (impermissible). *Id.* Thus, a court applying § 221 must
10 inquire as to whether the challenged deductions "resemble, in letter or spirit, [a] prohibited
11 [attempt to] recapture . . . expected wages for the purpose of saddling employees with prohibited
12 employer costs . . . ." *Prachasaisoradej v. Ralphs Grocery Co., Inc.*, 42 Cal. 4th 217, 236 (2007).

13 The Arbitrator finds that the first prong is satisfied because Claimant had control over
14 whether to incur such costs, and she exercised such discretion in a manner that she thought
15 would maximize her overall profitability. Thus, the deductions were tied to Claimant's sales
16 within the meaning of the *Marr* test. Zep should not be punished by providing Claimant with
17 tools to enhance her sales; indeed, Claimant was much better off because of Zep's investment in
18 novelty, promotional, and advertising materials and products, even if it made Claimant pay for
19 using such items. Claimant admittedly had discretion over pricing and whether to provide free
20 products, equipment, freight, samples, or novelties as part of her pricing and selling strategies.
21 All of the deductions challenged by Claimant directly affected the profitability of her selling
22 activities. For example, Claimant could choose to give demonstrations and samples of Zep
23 products in hopes that such investment would lead to customers ultimately buying that product.
24 Similarly, Claimant could offer free shipping, equipment, or products in order to make Zep
25 products comparatively more attractive than competing companies' products—which would in
26 turn lead to more sales and commissions for Claimant.

27 Claimant does not really challenge the applicability of the first prong of this exception.
28 Rather, she argues first that Zep cannot "retrospectively" claim that Claimant's commission
formula was actually a "net profit commission plan," which does not violate § 221. Claimant's

**FINAL AWARD**
- 33 -

1  argument is misplaced. California Labor Code § 221 does not contain any express requirement
2  that the employee understand that her commission formula is a "net profit commission plan"
3  within the meaning of § 221. Rather, the employer need only show that the plan *in fact* complies
4  with the exception set forth in *Marr v. Bank of America*. If it does, it does not violate § 221.

5      Claimant's second primary contention, however, does relate to the second prong of the
6  *Marr* test, which requires that the employee "agree to the deductions by contract." Claimant
7  essentially urges that she has *not* agreed to these deductions, because her commission structure is
8  governed solely by ¶ 2(a) of her Employment Contract, which provides: "The Company will pay
9  the Salesman a commission of 50% of the **profit on sales** made by the Salesman after deduction
10 the cost of merchandise sold plus a sum equal to 10% of the sales price for overhead expenses."
11 (Claim., Exh. 1 (emphasis added).) Claimant's premise therefore seems to be that this paragraph
12 does *not* contemplate deductions for expenses like novelties, promotional materials, and freight.
13 Thus, Zep must be taking these deductions *after* calculating the total amount of commissions
14 earned under the formula set forth in ¶ 2(a). These items are therefore being deducted from
15 "earned" commissions—which violates § 221. In other words, Claimant's premise is necessarily
16 that the profit formula set forth in Claimant's Employment Contract ¶ 2(a) entitled Claimant to
17 gross commissions *before* such costs are subtracted.

18     Claimant's reading, however, is inconsistent with the Employment Contract as a whole.
19 Specifically, her interpretation ignores the express language in paragraphs 7 and 8, which
20 explicitly provide that the employee shall pay 50% of the costs of all souvenirs, advertising
21 matter, and shipping charges when items are sent F.O.B. Moreover, paragraph 10 provides that
22 an employee shall bear certain expenses associated with merchandise returns that occur "through
23 no fault of the Company." (*See* Claim., Exh. 1, ¶¶ 7, 8, 10.)

24     Thus, ¶ 2(a) must necessarily be read in light of—and consistent with—these additional
25 provisions. And the most reasonable interpretation of the Employment Contract as a whole is
26 therefore that the term "profit on sales" in ¶ 2(a) of the Employment Contract means profits *net*
27 of souvenir, advertising, shipping, and return costs. In other words, a commission is not
28 "earned" within the meaning of § 221 until *after* these costs have been subtracted. The payment
   of a commission net of these costs therefore does not violate § 221 because Respondents paid the

1  full amounts earned under their "net profit commission plan." In short, because Zep expressly
2  provided for such deduction by contract—and because Claimant thereby agreed to such
3  deductions—the challenged commission deductions do *not* violate § 221.

4       Notably, Claimant has failed offer sufficient evidence to support a finding that
5  Respondents subtracted additional expenses from commissions that do *not* appear to be expressly
6  provided for in the Employment Contract—such as costs for credit cards and dispensers.
7  Specifically, the evidentiary record does not show whether such commission reductions were
8  properly provided for in subsequent agreements between Claimant and Respondents, in which
9  case they would also be valid under § 221.

10                          VII.   AWARD

11     A. *Damages*

12       The Arbitrator's decision is rendered in favor of Claimant Unrine in the amount of
13  **$64,621.14** for unreimbursed business expenses under California Labor Code § 2802. All other
14  claims are disposed of as set forth herein, and all claims not expressly addressed above are
15  rejected. Claimant's award is calculated as follows. Claimant is entitled to automobile expenses
16  of (a) $1,891.25 for 2006, (b) $15,520.00 for 2007, (c) $11,040.62 for 2008, (d) $9,570.00 for
17  2009, (e) $11,342.50 for 2010, and (f) $5,128.56 in 2011 for a total of **$54,492.93** in
18  unreimbursed automobile expenses. Claimant is further entitled to 50% of her claimed cell phone
19  expenses, or (a) $64.88 in 2006, (b) $760 in 2007, (c) $633 in 2008, (d) $721 in 2009, (e)
20  $834.50 in 2010, and (f) $656.50 in 2011, for a total of **$3,669.88** in unreimbursed cell phone
21  expenses. Claimant is also entitled to 50% of her claimed internet expenses, or (a) $8.42 in
22  2006, (b) $35.50 in 2007, (c) $50.50 in 2008, and (d) $50 in 2009, for a total of **$144.42** in
23  unreimbursed internet expenses. Finally, Claimant is entitled to all claimed "business telephone"
24  expenses of (a) $131.91 in 2006, (b) $1,284.00 in 2007, (c) $1,249.00 in 2008, (d) $1,200 in
25  2009, (e) $1,874.00 in 2010, and (f) $575 in 2011, for a total of **$6,313.91** in unreimbursed
   business telephone expenses.

26       Claimant is therefore the prevailing party in this litigation. As the prevailing party,
27  Claimant has requested an award of attorneys' fees in the amount of $222,031.50, plus an
28  additional $7,390.00 incurred since filing the Motion for Attorney's Fees; costs in the amount of
   $5,721.31; and prejudgment interest in the amount of $33,857.39 as of May 2, 2014, and

continuing every day thereafter at a rate of $17.70 per day. Claimant's request is hereby granted in part and denied in part.

### B. *Attorney's Fees*

#### 1. *Claimant is Entitled to Reasonable Attorneys' Fees*

Claimant submits that $222,031.50 is a reasonable award based on the following analysis: First, based on the respective number of hours and hourly rates expended by each attorney that has worked on this matter, Claimant submits a total lodestar amount of $172,088.00. Claimant then offers to reduce this figure (because Claimant did not prevail on the commission-deduction component of her claim) to a requested lodestar amount of $148,021.00 for work performed by Claimant's counsel on her successful claims. Finally, Claimant requests a lodestar multiplier "in an amount to be determined by the arbitrator but . . . no less than 1.5," which would produce a total fee award of $222,031.50.

JAMS Rule 24(g) grants the Arbitrator broad authority to "allocate attorney's fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' agreement or allowed by applicable law." The "applicable law" here is California Labor Code § 2802, which provides for reasonable attorneys' fees expended in enforcing an employee's rights granted thereunder:

> An employer shall indemnify his or her employee for all necessary expenditures
> or losses incurred by the employee in direct consequence of the discharge of his
> or her duties . . . . For purposes of this section, the term "necessary expenditures
> or losses" shall include all reasonable costs, including, but not limited to,
> attorney's fees incurred by the employee enforcing the rights granted by this
> section." Cal. Lab. Code § 2802.

The present suit was successfully brought in order to "enforce" Claimant's right for reimbursement of myriad business expenses, and therefore Claimant is entitled to attorney's fees.

In calculating reasonable attorneys' fees, California courts employ the lodestar approach, which involves multiplying the number of hours "reasonably" expended by a "reasonable" hourly rate. *See Serrano v. Priest (Serrano III)*, 20 Cal.3d 25, 48–49 (1975). In determining whether requested attorneys' fees are reasonable, the Arbitrator considers numerous factors, including but not limited to: "[1] the nature of the litigation and its difficulty;

[2] the amount of money involved in the litigation; [3] the skill required and employed in handling the litigation; [4] the attention given to the case; [5] the attorney's success, learning, age and experience in the particular type of work demanded; [6] the intricacy and importance of the litigation; [7] the labor and necessity for skilled legal training and ability in trying the case; and [8] the amount of time spent on the case. *Niederer v. Ferreira*, 189 Cal. App. 3d 1485, 1507 (1987). Ultimately, though, "[t]he Court has broad discretion to determine the amount of a reasonable fee . . . ." *EnPalm, LCC v. Teitler Family Trust*, 162 Cal. App. 4th 770, 774 (2008); *see also PLCM Group v. Drexler*, 22 Cal. App. 4th 1084, 1088 (2000); *Advanced Micro Devices v. Intel*, 9 Cal. 4th 362 (1994). This broad discretion should be guided by equitable considerations. *PLCM Group*, 22 Cal. App. 4th at 1095.

Exercising this broad discretion, the Arbitrator finds that the hourly rates of Claimant's attorneys are reasonable and in line with the prevailing rates in the area. Both Daniel J. Palay, a partner with 22 years of experience, and Alejandro P. Gutierrez, a partner with 31 years of experience, billed at a rate of $700 per hour; Michael A. Strauss, who has seven years of practice experience, billed at a rate of $500 per hour; Adam A. Acevedo, who has six years of experience, billed at a rate of $350 per hour; Andrew C. Ellison, a second year associate, billed at a rate of $250 per hour; and Coleen DeLeon and Debra D. Acevedo, paralegals, billed at a rate of $180 per hour.

Claimant has offered more than sufficient evidence in support of the reasonableness of these rates. First, these rates reflect each attorney's *actual* billing rate for commercial cases in the San Francisco Bay Area, where these attorneys regularly practice and where this suit was originally filed. Additionally, these rates are justified because Claimant's attorneys have particular experience in the area of employment litigation, especially Mr. Gutierrez and Mr. Palay (who were court-appointed class counsel in the prior class action) and Mr. Strauss (*See* Gutierrez Declaration ISO Motion for Award of Attorney's Fees ["Gutierrez Decl. ISO Fees"] ¶ 5; Palay Declaration ISO Motion for Award of Attorney's Fees ["Palay Decl. ISO Fees"], ¶ 30; Declaration of Michael A. Strauss ISO Motion for Attorney's Fees ¶¶ 11, 13). Claimant has also submitted an affidavit by James M. Finberg, who specializes in complex multi-plaintiff wage-and-hour cases, attesting to the prevailing fees of local attorneys in the Bay Area. (*See* Declaration of James M. Finberg ["Finberg Decl."], ¶ 10.) The Ninth Circuit has held that such affidavits may properly be considered as evidence of prevailing legal rates. *See United*

1  *Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). Mr. Finberg has just

2  over 30 years of experience—substantially the same experience as Messrs. Palay and Gutierrez.

3  (Finberg Decl. ¶¶ 2-10.) In his affidavit, Mr. Finberg, whose hourly rate is $895, agrees that the

4  hourly rates requested in this case are well within the range of fair market rates charged by

5  similarly experienced attorneys in the Bay Area. (*Id.* ¶¶ 12, 15-16.) In sum, it follows from this

6  evidence that Claimant's attorneys' rates are well within the range of those generally charged by

   attorneys with like experience and expertise.

7      Additionally, the Arbitrator finds that these rates properly reflect the degree of

8  complexity of this case, the risk inherent in Claimant's attorneys' contingency fee arrangement,

9  and the degree of success (i.e. prevailing on the threshold issue as to the enforceability of the

10 Settlement Agreement and on one of Claimant's claims) obtained by Claimant's counsel in this

11 case. To the extent Respondents seek to compare Claimant's requested attorneys' fees to those

12 awarded in other cases, a higher fee is justified here because of the *ex ante* possibility that the

13 Settlement Agreement might have entirely precluded Claimant's recovery. The presence of the

14 Settlement Agreement therefore both increased the complexity of this case and created additional

15 risk of non-recovery.

16      The Arbitrator also finds the number of hours requested—291.9 expended on this

17 litigation—to be generally reasonable, subject to the partial reduction set forth below. As a

   threshold matter, the Arbitrator finds the Claimant's attorneys' billing records are accurate, and

18 therefore support the hours alleged.

19      As Claimant correctly notes, this case (and particularly her expense reimbursement

20 claim) was document-intensive and required Claimant and her counsel to gather, organize, and

21 produce over one thousand, three hundred and eighty documents detailing Claimant's expenses

22 since 2006. (Declaration of Debra D. Acevedo ISO Motion for Award of Attorney's Fees and

23 Costs, ¶ 8.) Moreover, it involved pre-trial motion practice, and, in addition to putting on her

24 own case, Claimant had to brief and argue Respondents' counter-claims for breach of contract,

25 declaratory relief, and unjust enrichment. Indeed, both sides of this dispute represented their

26 respective clients vigorously every step of the way, which necessarily increased the billable

   hours in this case.

27      2.  *Claimant's Fee Recovery Is Reduced, In Part, Due to Her Failure to Prevail on*

28          *All Aspects of Her Claims*

"Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims . . . a reduced fee award is appropriate when a claimant achieves only limited success." *Chavez v. City of Los Angeles*, 47 Cal. 4th 970, 989 (2010) (internal citations & quotations omitted). "If a plaintiff has prevailed on some claims but not others, fees are not awarded for time spent litigating claims unrelated to the successful claims, and the trial court 'should award only that amount of fees that is reasonable in relation to the results obtained.' [citation] . . . [a]lthough attorney fees need not be strictly proportionate to the damages recovered . . . ." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983)); *Harman v. City & Cnty. of San Francisco*, 158 Cal. App. 4th 407 (2007).

Here, Claimant prevailed on her § 2802 cause of action for expense reimbursement but not on her § 221 cause of action for unauthorized deductions. Though involving some of the same threshold issues (i.e. the enforceability of the Settlement Agreement), these claims are *not* so inextricably intertwined that apportionment would be impossible or improper. On the other hand, a pure 50/50 split would be inappropriate here because Claimant's claims were premised on the same threshold issue, to which many of Claimant's hours may be attributed, and because the nature of Claimant's expense reimbursement claim necessarily rendered it the more time-consuming of the two claims. Thus, Claimant's attorneys' fees should be reduced by the percentage of hours that can clearly be distinguished as unrelated to Claimant's successful cause of action. After reviewing Claimant's documentation supporting her attorneys' fees request (*cf.* Palay Decl., Exh. C; Gutierrez Decl., Exh. A), the Arbitrator finds that 80 percent of Claimant's requested lodestar hours were expended in pursuit of one or more of the following: (i) Claimant's claim that the Settlement Agreement was unenforceable, (ii) Claimant's claim for unreimbursed business expenses, or (iii) Claimant's defense of Respondents' counterclaims. All such hours were therefore reasonable and compensable.

Accordingly, the Arbitrator finds that 20 percent of Claimant's requested lodestar hours were expended solely in pursuit of her unsuccessful unlawful deductions claim. Claimant's requested lodestar recovery is $172,088.00. This amount is therefore reduced by 20 percent ($34,417.60) for a net lodestar recovery of **$137,670.40.**

### 3. *Claimant Is Not Entitled to a Multiplier*

"[Fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could

earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied." *Pennsylvania v. Del. Valley Citizens' Council*, 478 U.S. 546, 565-56 (1986). In recognition of these principles, multipliers or fee enhancements are permitted only in "exceptional" circumstances. *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010). Furthermore, "there is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Id.* at 552-53.

Thus, the mere fact of contingency cannot itself merit upward adjustment because (quite simply) the contingent nature of the representation—and the inherent risk of loss that the attorney may not recover if the plaintiff does not prevail—is a factor that has *already* been taken into consideration in determining the attorney's hourly rate under the general lodestar formula. *See Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1175 (1998). Rather, fee enhancement *may* be proper if "the public value of the case is great, and the risk of loss results from the complexity of the litigation or the uncertainty of the state of the law." *Id.* Alternatively, the lack of a clear statutory basis for shifting attorney's fees to the defendant may justify a multiplier because, in that circumstance, the plaintiff's attorney runs an additional risk that *even if he prevails*, he will be unable to collect his fees. *See Serrano v. Priest*, 5 Cal. 3d 584 (1971). Finally, a court may award a multiplier for "exceptional representation," but "*only* when the quality of representation *far exceeds* the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation. Otherwise, the fee award will result in unfair double counting and be unreasonable." *Ketchum v. Moses*, 24 Cal. 4th 1122 (2001) (emphasis added).

None of these factors are present here. The present case is not uniquely in the public interest; rather, it involves a private adjudication of a single employee's rights. Moreover, § 2802 of the California Labor Code has provided a clear statutory basis for recover of attorney's fees for Claimant's claims throughout the entire duration of this litigation. Finally, though

Claimant's counsel were diligent and competent in their representation of Claimant, the quality of representation has been fairly compensated by the $700/hour rates that they have claimed in the lodestar formula.

In sum, Claimant's request for a fee multiplier is hereby DENIED.

### 4. *Additional Attorney's Fees For Time Incurred Preparing Claimant's Reply and Opposing Respondents' Motion for Reconsideration*

Claimant further seeks an additional $7,390.00 in attorneys' fees incurred in preparing Claimant's Reply In Support of her Motion for Attorney's Fees and in opposing Respondents' Motion for Reconsideration. Because the Arbitrator has granted Claimant's initial request for attorney's fees and has denied Respondents' Motion for Reconsideration, *see infra*, Claimant is also entitled to attorney's fees necessarily expended in securing her right to attorney's fees pursuant to § 2802.

As already determined above, the rates sought by Claimant's counsel are reasonable. The Arbitrator further finds that the requested fee of $7,390.00 is a reasonable approximation of the value of the services set forth in the preceding paragraph. (*See* Supplemental Declaration of Daniel J. Palay ISO Motion for Award of Attorney's Fees, Costs, and Interest, Exh. E.) The Arbitrator therefore holds that Claimant is entitled to an additional $7,390.00 in attorneys' fees, for a total attorneys' fee award of **$145,060.40.**

### 5. *Respondents Are Not Entitled to Attorney's Fees*

Respondents have also filed a Cross-Motion for Attorney's Fees in the present case on the theory that they prevailed on the § 221 claim. Respondents urge that, at the time of commencement of this Arbitration, Labor Code § 218.5 provided as follows: "In any action brought for the nonpayment of wages, . . . the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of this action." Cal. Lab. Code § 218.5 (2013). In 2012, the California Supreme Court interpreted this provision as available to both the employee and the employer. *See Kirby v. Immoos Fire Prot., Inc.*, 53 Cal. 4th 1244, 1248 (2012) ("[I]t is a two-way fee-shifting provision.") The California Legislature then amended § 218.5, effective January 1, 2014, and it now provides that a prevailing employer is entitled to fees "only if the court finds that the employee brought the court action in bad faith." Cal. Lab. Code § 218.5 (2014).

Claimant requests that the Arbitrator strike Respondents' Motion for Fees and Costs

pursuant to Code of Civil Procedure § 436 on the grounds that the Interim Award invited only Claimant to file a motion for attorneys' fees and costs. Claimant's request is hereby DENIED; however, Respondents' request for attorney's fees and costs is likewise DENIED for the reasons set forth below.

Respondents' position must be rejected for two reasons. To start with, Respondents were not 'prevailing parties'; rather, Claimant prevailed on nearly every aspect of this case. The Arbitrator's decision was rendered in favor of Claimant on the release issue, and on Claimant's § 2802 claim, and against Respondents on all counter-claims for breach of contract, declaratory relief, and unjust enrichment. Thus, under no reasonable definition should Respondents be classified as the "prevailing party"—regardless of which version of § 218.5 is applied here.

Second, the post January 1, 2014 version of § 218.5 applies to a request for attorney's fees filed in May of 2014. "A lawsuit is governed by a change in procedural rules made during its pendency, and the suit is pending until its final determination on appeal." *Kievlan v. Dahlberg Elecs.*, 78 Cal. App. 3d 951, 959 (1978). A provision is substantive when it creates a new cause of action, and procedural when it is merely "ancillary to the underlying cause." *Id.* Applying this test, the court in *Kievlan* found that an attorney fee provision was procedural and therefore any amendments during the pendency of litigation applied to that case. *Id.* Indeed, "statutory enactments providing for awards of attorney's fees made after the occurrence of an event and during the pendency of legal proceedings and appeals have been held to be applicable on various theories." *Wood v. McGovern*, 167 Cal. App. 3d 772, 775-76 (1985) (citing *Olson v. Hickman*, 25 Cal. App. 3d 920, 922 (1972); *Woodland Hills Residents Assn., Inc. v. City Council*, 23 Cal. 3d 917, 932 (1979)).

Similarly here, § 218.5 is procedural because it allows a prevailing party to recover attorney fees in "any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions." Cal. Lab. Code § 218.5(a). Hence, a substantive statute upon which an award of fees under § 218.5 may be based would be any statute (like Labor Code § 221) that proscribes conduct with respect to the payment of wages, fringe benefits, or pension fund contributions. Section 218.5 is procedural because it merely provides for *ancillary* relief if a party prevails on one of these *substantive* claims listed in § 218.5.

Thus, under current law, an employer is entitled to attorney's fees and costs *only if* the employer is both the "prevailing party" *and* "the court finds that the employee brought the court

1  action in bad faith." *See* Cal. Labor Code § 218.5. Claimant clearly did not act in bad faith in
2  bringing any claim in this lawsuit. Although the Arbitrator ultimately disagreed with Claimant's
3  interpretation of § 2(a) of her Employment Contract, Claimant offered a tenable claim that was
4  brought in good faith. Thus, there is no valid statutory basis for Respondents' Cross-Motion for
5  Attorney's Fees and Costs.

6         C. *Costs*

7         As the prevailing party, Claimant has sought costs as follows: (1) $2,245.48 in deposition
8  costs incurred by Palay Law Firm (*see* Palay Decl. ¶ 36, Exh F.), (2) $735.45 in deposition fees
9  incurred by Hathaway (*see* Gutierrez Decl. ¶ 32, Exh. B), (3) $2,696.98 in arbitration transcript
10 fees (*see id.*) and (4) $43.40 in delivery costs (*see id.*). Respondents have filed a counter Motion
   to Tax Costs.

11        JAMS Rule 24(g) grants the Arbitrator the authority and discretion to "allocate attorneys'
12 fees and expenses and interest (at such rate and from such date as the Arbitrator may deem
13 appropriate) if provided by the Parties' agreement or allowed by applicable law." JAMS
14 Comprehensive Arbitration Rules, at 24(g). Here, Claimant has sought costs pursuant to § 2802.
15 However, the law vests the Arbitrator with substantial discretion in awarding costs to a
16 prevailing party: "[T]he court, in its discretion, may allow costs or not and, if allowed[,] may
17 apportion costs between the parties on the same or adverse sides pursuant to rules adopted under
18 Section 1034." *Id.*; *Oak Grove Sch. Dist. of Santa Clara Cnty. v. City Title Ins. Co.*, 217 Cal.
19 App. 2d 678, 699 (1963) ("The determination of the items allowable as costs is largely a question
20 for the trial court in its discretion."); *Von Goerlitz v. Turner*, 65 Cal. App. 2d 425, 432 (1944)
21 (stating the same principle). Additionally, California law provides that even generally
22 "allowable" costs are recoverable only when they are "reasonably necessary to the conduct of the
23 litigation." Cal. Civ. Proc. Code § 1033.5(c)(2). Conversely, otherwise permissible costs that
24 are "*merely convenient or beneficial* to [trial] preparation" are not allowable. *Id.* (emphasis
25 added); *Ladas v. California State Auto. Assn.*, 19 Cal. App. 4th 761, 775-76 (1993) (holding that
26 attorney lunches and local travel expenses were "merely convenient or beneficial" to preparation
27 for litigation, but not "necessary" within the meaning of section 1033.5); *Perko's Enterprises,*
28 *Inc. v. RRNS Enterprises*, 4 Cal. App. 4th 238, 243 (1992) ("The determination of the necessity
   and reasonableness of a particular expense was within the broad discretion of the court.").

Based on these principles and exercising her broad discretion, the Arbitrator hereby GRANTS Respondents' Motion to Tax Costs as to all costs sought by Claimant. The Arbitrator finds that the costs sought here are not allowable. Claimant has been granted a substantial recovery for attorney's fees in the present case, and therefore an additional allowance for the costs requested would be inequitable. Claimant's request for costs is therefore denied in full.

On the other hand, Respondents' Counter-Motion for Costs is also DENIED for the same reasons that their request for attorneys' fees was denied. First, Respondents are not the prevailing party under §1032, and therefore are not entitled to recover their costs in this arbitration. Second, even if Respondents were prevailing parties, the current version of § 218.5 applies here. Respondents therefore cannot recover costs absent a showing that Claimant brought her unlawful deduction claim in bad faith. Respondents have failed to make this showing.

### D. *Pre-Judgment Interest*

An employer is liable for prejudgment interest of all business-related expenses that an employer unlawfully fails to reimburse. "All awards made by a court . . . for reimbursement of necessary expenditures under [§ 2802] shall carry interest at the same rate as judgments in civil actions. Interest shall accrue from the date on which the employee incurred the necessary expenditure or loss." Cal. Lab. Code § 2802. Claimant is therefore entitled to prejudgment interest at the statutory rate of 10% per annum for her unreimbursed mileage, cell phone, internet, and business phone expenses, which total $64,621.14. Respondents urge that the accrual of interest on Claimant's expense claim should be suspended for the period during which Claimant pursued her claims in court. However, Respondents offer no sound legal basis for their request. Moreover, there was no undue delay in this arbitration so as to justify a suspension of the accrual of prejudgment interest. In fact, the Arbitrator finds that this arbitration was handled efficiently and professionally by both parties. For each of these reasons, Claimant is entitled to prejudgment interest at the statutory rate of 10 percent per annum.

Claimant is therefore entitled to $34,211.48 in prejudgment interest as of May 23, 2014, and an additional $1,362.90 from that date until **August 8, 2014** (a rate of $17.70 per day) for a total of **$35,574.38** in prejudgment interest.

### E. *Respondents' Motion for Reconsideration*

JAMS Rule 24(i) provides that "[w]ithin seven (7) calendar days after service of a Partial Final Award or Final Award by JAMS, any Party may serve upon the other Parties and on JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award."

Pursuant thereto, Respondents seek correction of an alleged "computational error" regarding Claimant's mileage award. However, the Arbitrator already heard and rejected this argument in her Interim Award. As previously found, the alleged "discrepancies" in Claimant's mileage records are due to the fact that Claimant owned and operated two, separate Mercedes, as well as to minor recording errors committed by auto maintenance companies. As previously noted, Claimant kept meticulous records—in particular *tax records*—which support her position with respect to this matter. The Arbitrator finds that Claimant did not falsify her tax records, and accepts Claimant's tax records as true and sufficient to support the Award granted here. Thus, there simply is no 'typographical' or 'mathematical' problem to be corrected.

Respondents also seek an "offset" of Claimant's recovery in the amount of the settlement check for $16,639.01 that Respondents claim Claimant received as consideration for her execution of the Settlement Agreement. However, Respondents have failed to offer any evidence, such as a bank statement, proving that Claimant accepted such funds. Respondents have had ample opportunity both before and at trial to offer such evidence and to argue that an offset should be granted here. They failed to do so. They have further failed to submit any evidence that the check was cashed with their Motion for Reconsideration. Respondents' request for an offset is therefore DENIED.

In response to Respondents' Motion, Claimant has herself sought reconsideration of the Arbitrator's holding on the issue of deductions for items such as credit cards and dispensers, which Claimant urges was not part of the "formula." To clarify the Arbitrator's holding in the Interim Award, Claimant is correct that the commission formula in the parties' original agreement did not specifically provide for such deductions. However, the Arbitrator simply finds that Claimant has not offered sufficient, persuasive evidence to convince the Arbitrator that the Parties did not nonetheless have some form of valid understanding that—because Claimant would have *discretion* in determining whether to provide these items to customers at low or no cost—the cost of such items was to be taken into consideration in the commission formula.

For all of the foregoing reasons, both Claimant's and Respondents' Requests for

1  Reconsideration are DENIED.

2      F. *Conclusion*

3        In sum, the Arbitrator finds that Claimant's Motion for an Award of Attorney's Fees,

4  Costs, and Interest is GRANTED IN PART. Respondents' Cross-Motion for Attorney's Fees,

5  Or, in the Alternative, Offset to Claimant's Fee Request is DENIED. However Respondents'

6  Motion to Tax Costs is GRANTED. Claimant's Motion to Strike Surreply Filed by Respondents

7  is DENIED, and Respondents' Request for Correction of a Computation Error and/or for

8  Reconsideration is DENIED.

      In summary, Claimant is entitled to **$64,621.14** in damages, **$145,060.40** in attorneys'

9  fees, and **$35,574.38** in prejudgment interest as of August 8, 2014, for a total recovery of

10  **$245,255.92**.

11

12

13

14  Dated: August _8_, 2014

                    _Diane Wayne_

15                      HON. DIANE WAYNE (RET.)

16                      ARBITRATOR

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Unrine, Astrid vs. Zep, Inc. et al.
Reference No. 1220046530

I, Katie Gordon, not a party to the within action, hereby declare that on August 08, 2014 I served

the attached FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof

enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles,

CALIFORNIA, addressed as follows:

Alejandro P. Gutierrez Esq.
Hathaway Perrett Webster, et al.
5450 Telegraph Rd.
Suite 200
Ventura, CA  93003
Phone: 805-644-7111
agutierrez@hathawaylawfirm.com
 Parties Represented:
 Astrid Unrine

Y. Anna Suh Esq.
Hunton & Williams LLP
575 Market St
Suite 3700
San Francisco, CA  94105
Phone: (415) 975-3700
asuh@hunton.com
 Parties Represented:
 Acuity Specialty Products, Inc.
 Zep, Inc.

Daniel J. Palay Esq.
Palay Law Firm
121 N. Fir St.
Suite F
Ventura, CA  93001
Phone: (805) 641-6600
djp@palaylaw.com
 Parties Represented:
 Astrid Unrine

Kurt A. Powell Esq.
Robert T. Dumbacher Esq.
Hunton & Williams LLP
600 Peachtree St., NE
Suite 4100
Atlanta, GA  30308-2216
Phone: 404-888-4000
kpowell@hunton.com
rdumbacher@hunton.com
 Parties Represented:
 Acuity Specialty Products, Inc.
 Zep, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on August 08, 2014.


Katie Gordon
kgordon@jamsadr.com