UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON AGUILAR, et al., | Case No. 13-cv-00563-WHO |
| Plaintiffs, | |
| v. | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| ZEP INC., et al., | Re: Dkt. Nos. 128, 155, 160, 165, 171, 177 |
| Defendants. | |

**INTRODUCTION**

This Order resolves a grab-bag of issues related to the employment claims of plaintiffs Brian Calle, Robert Hoppe, and Theron Lee, who were employed by defendants Zep, Inc. and Acuity Specialty Products, Inc. (together, "Zep") as outside sales representatives to sell janitorial and sanitation supplies. Plaintiffs move for partial summary judgment that Zep illegally deducted commissions from their wages in violation of Labor Code § 221. Dkt. No. 128. Zep filed a cross motion for partial summary judgment, asserting that its deductions were lawful. Dkt. No. 177. In addition, Zep moves for summary judgment that: (i) Calle and Hoppe are estopped from asserting their claims because they failed to disclose this lawsuit in Chapter 7 bankruptcy proceedings; and (ii) Calle and Lee's California state law claims are barred during the time that they lived and worked outside of California. *See* Dkt Nos. 155, 160, 165. Finally, Zep moves for partial summary judgment on certain business expense claims asserted by plaintiffs under California Labor Code section 2802. Dkt. No. 171.

To unpack these motions, Zep is not entitled to summary judgment that judicial estoppel bars Calle's and Hoppe's claims because there are material issues of fact whether the omissions on their bankruptcy petitions were inadvertent or mistaken. It is entitled to summary judgment on Calle's and Lee's California Labor Code claims for the work they performed outside of California,

but not Lee's assertion of claims for expenses and deductions incurred as a direct result of work he performed in California while living in Nevada.

The plaintiffs are entitled to reimbursement of deductions that shifted the costs of doing business to the plaintiffs, such as the credit card fees, phone order fees, and costs deducted for repairs not caused by the fault of the plaintiffs. There are material issues of fact whether there was an implied-in-fact agreement that would allow Zep to deduct other items, such as free products, free freight, minimum order fees, collections, novelties and literature, and costs of returned items.

The plaintiffs also must be reimbursed for commuting, cell phone, and internet expenses, because these business expenses were incurred as a direct consequence of their employment duties. The plaintiffs are not entitled to reimbursement for gifts, meals, and entertainment.

## FACTUAL BACKGROUND

Plaintiffs Calle, Lee, and Hoppe worked for Zep as outside sales representatives selling cleaning products for a variety of home and industrial applications. They earned wages based on commissions from the products they sold.

### A. Facts Pertinent to Commissions and Expenses Claims

Under Zep's commissions model, each sales representative received a commission equal to fifty percent of the excess of the sales representative's net sales over the total cost of the products sold, plus ten percent of the sales price. *See* Gutierrez Decl., Ex. G, Henson Dep. at 88:7-17 (compensation consisted of commissions that were calculated "by taking the sales price, deducting the cost of products, adding 10 percent of the selling price and the rep would get half of the balance."). Zep employee literature explains the commissions model as follows:

Net sale - 10%
Gross Sale - Cost of Goods Sold
Gross Profit Dollars ÷ 2 (50:50 Rep/Zep)
Net Profit Dollars ÷ Net Sale = Comm. %

Gutierrez Decl., Ex. F. This formula applied to all of Zep's California sales representatives, including the plaintiffs. Henson Dep., 83:10- 84:12, 88:12-17; Lee Dec., ¶ 2. There is no evidence that Calle, Hoppe, or Lee signed any agreement with Zep that set forth this commission

2

formula in writing.[1]  Lee Dec., ¶ 2

The plaintiffs were responsible for acquiring their own customers, interacting with them, and knowing their purchasing preferences.  Zep's business model gave the plaintiffs various pricing tools to address the pricing sensitivities of their customers and maximize their selling opportunities.  Some of these pricing tools were the ability to price the products they sold and offer discounts to customers, free freight allowances, and "buy one, get one free" promotions.  Plaintiffs had the discretion to create these deals to increase their selling opportunities.  They were able to adjust the price of the promotional bundles to manage the profitability of the transaction.  For example, Hoppe's commissions data for April 2009 reflects that he charged a customer $592.32 for 12 units of ZEP Brake Flush Aerosol ($49.36 per unit) and gave the customer three additional units at no charge.  For another customer, Hoppe charged $78.54 for two units of Zepp Brake Flush Aerosol ($39.27 per unit) and did not give away any free products.  Ward Dec., ¶ 5, Ex. C.  Plaintiffs Calle and Lee provided similar types of pricing discounts, free freight deals, novelties, literature, and free products to their customers.  *Id*., ¶¶ 5-8, Exs. A-B.

Zep deducted amounts from the plaintiffs' commissions for certain activities.  When the plaintiffs provided customers with free samples of Zep products, Zep logo-bearing novelties, or Zep literature, the costs of these items were deducted from the plaintiffs' commissions.   When a customer used a credit card to pay for Zep merchandise, Zep deducted the credit card fees from the plaintiffs' commissions.  When a customer returned an item, plaintiffs were required to pay back their commission and any freight charges for return of the product to Zep.  If the customer did not pay its bill and the matter went to collections, the cost of collections was also deducted from the plaintiffs' commissions.  When Zep repaired machines and equipment sold by the plaintiffs, the cost of repairs was deducted from their commissions.  In May 2008, Zep began making a $10 deduction from the plaintiffs' commissions each time they placed an order over the phone instead of via the internet, and it began paying ½ commissions for orders between $50 to $150 because it considered these orders to be "unprofitable."  *See* Gutierrez Dec., Ex. O, Stadler Dec., ¶¶ 8-11;

---

[1] Hoppe and Lee each entered into a Zep Restrictive Covenant Agreement when they were hired, but this agreement did not set forth the commission model.  Lee Decl. ¶ 2; Hoppe Decl. ¶ 2.

United States District Court
Northern District of California

Ward Dec., Exs. D, E; Lee Dec., ¶¶ 4-8; Hoppe Decl., ¶¶ 4-8; Calle Decl., ¶¶ 4-8.

ZEP's Director of Sales stated that the free freight and product deductions were not part of the commission formula.

Q. The free freight or free product would be amounts that would be deducted from the sales rep's commissions, correct?

A. Correct.

Q. That would be in addition to -- that would be a deduction in addition to the formula we talked about earlier, which is selling price, minus cost of product, plus 10 percent selling and one half the balance, correct?

A. Correct.

Gutierrez Dec., Ex. G, Henson Depo, 88:18-89:11.

The plaintiffs received monthly commission statements that set out positive "credits" and negative "debits" associated with each plaintiff's selling activities, and which collectively resulted in the total "net sales" line on the last page of each plaintiff's monthly commission statement from which their commissions were then calculated. Ward Dec., ¶ 3. *See also* Calle Dep. at 42:7-22, Ex. 3 (sample commission statements) at 5; Lee Dep. at 27:14-17, 27:22-24. The plaintiffs understood that their wages were calculated based on these deductions and Zep's commissions model. *See e.g.*, Calle Dep. at 42:23-46:11; Hoppe Dep. at 57:25-59:22. The plaintiffs did not sign any agreement with Zep that set forth these deductions in writing. Lee Decl., ¶¶ 4-8; Hoppe Decl., ¶¶ 4-8; Calle Decl., ¶¶ 4-8.

The plaintiffs also incurred business expenses for items such as "miles driven," "cell phone," "internet," "gifts," and "meals and entertainment." Zep's corporate policy until 2011 was that outside sales representatives were not reimbursed for business-related expenses. During their employment with Zep, each of the plaintiffs maintained a home office from which they made Zep sales calls and entered sales orders online. Zep encouraged plaintiffs to travel to at least 20 customer locations each day and required plaintiffs to use their own vehicles. Calle claims $24,930.42 in business expenses for items such as "miles driven," "cell phone," "Comcast internet," and "gifts." Hoppe claims $37,596.75 for similar deductions. Lee claims $80,769.47 for similar deductions, as well as "meals and entertainment." Dkt. No. 171 at 2-3; Suh Dec., ¶ 2, Exs. A, B, C.

United States District Court
Northern District of California

4

**B.  Facts Pertinent to Plaintiff Brian Calle**

Calle began working for Zep in 2004 as an outside sales representative in California. Grossman Decl. ¶ 3.  In March of 2008, he and his wife purchased a house in Colorado.  Suh Decl., Ex. E ("Calle Dep.") at 21:11-18.  In September of 2008, Calle moved to his home in Colorado and requested that Zep transfer him to Colorado.  *Id*. at 16:21-23, 17:15-19, 21:19-22. In Colorado, Calle was supervised by a new Colorado-based manager and all of his California accounts were transferred to other California sales representatives.  *Id*. at 17:22-18:16; 19:14-19. Calle did not service or physically visit any customers in California after he moved to Colorado. *Id*. at 19:20-24; 20:11-21:5.  Calle's employment with Zep ended in March of 2009. Grossman Dec., ¶ 6.

On March 14, 2012, Calle signed the Request and Consent for Joinder to Become a Party Plaintiff in the Britto Action.  Calle Dep., 32:5-16, Ex. 2.  On May 4, 2012, he filed for Chapter 7 bankruptcy in the Bankruptcy Court for the District of Colorado, in the matter styled *In re Calle*, Case No. 12-19249-EEB.  Calle Dep., 80:5-16, 84:15-22, Ex. 6 (bankruptcy petition).  He was represented by a bankruptcy attorney in the filing of the bankruptcy, and he met with his attorney on multiple occasions regarding his petition.  Calle Dep., 79:7-11, 80:13-16, 83:2-17.  He did not disclose his claims against Zep in his bankruptcy petition and supporting schedules.  On the Statement of Financial Affairs portion of the petition where he was required to identify "suits and administrative proceedings" to which he was "a party within one year immediately preceding the filing of [the] bankruptcy," Calle responded that he had "none." Calle Dep. Ex. 6 at 9, No. 4.  He also did not list the claim on Schedule B of the bankruptcy petition where he was required to disclose "contingent and unliquidated claims of any nature," and "other personal property of any kind." *Id*. at pp. 17-19, Nos. 21, 35.  Calle states that:

> At the time I filed for bankruptcy and submitted my initial schedules, I did not fully understand the complicated bankruptcy forms.  As a result, I did not list my claims against [Zep] as I did not realize these claims were supposed to be listed on the schedules.  This omission is not an intentional effort to defraud the bankruptcy court or my creditors, but simply an honest mistake.

Calle Dec. ¶ 4.  Calle obtained a discharge of his debt on August 17, 2012.  *See* Dkt. No. 158, Request for Judicial Notice ("Calle RJN"), Ex. 1 (order of discharge).

1     Zep asserted that plaintiff Keith Britto was judicially estopped from bringing

2 claims he failed to disclose in his bankruptcy petition on February 28, 2013.  Suh Dec., ¶ 9,

3 Ex. I.  Calle asserts that "in 2013, I learned for the first time that I should have included

4 these claims on my bankruptcy schedules.  Soon thereafter, I contacted my bankruptcy

5 attorney to fix my error."  Calle Dec., ¶ 5.  On June 13, 2013, Calle moved to reopen his

6 bankruptcy to amend his schedules to include his claims against Zep.  Calle RJN, Ex. 2.

7 On June 14, 2013, the bankruptcy court granted his motion to reopen his bankruptcy case

8 and amend his schedules.  Calle RJN, Ex. 3.  On July 1, 2013, Calle and the trustee of his

9 estate entered into an agreement to sell the estate's interest in his claims to Calle in return

10 for 25% of any recovery he obtains.   Anstine Dec., ¶ 3, Ex. A.  On July 3, 2013, the

11 trustee gave his creditors notice of the claims and thirty days to object to the sale.  Anstine

12 Decl. ¶ 6, Ex. B.  The trustee received no objections.  Anstine Dec., ¶ 7.  The bankruptcy

13 court approved the agreement on July 30, 2013.  Calle RJN, Ex. 5.

14     **C.  Facts Pertinent to Plaintiff Robert Hoppe**

15     Robert Hoppe began working for Zep in October 2005 as an outside sales

16 representative in California.  Grossman Dec. ¶ 3.  His employment with Zep ended in February of

17 2010.  Grossman Dec. ¶ 6.  On October 20, 2010, he filed for Chapter 7 bankruptcy in the

18 Bankruptcy Court for the Northern District of California in the matter styled *In re Hoppe*, Case

19 No. 10-14027.  Hoppe Dep., 44:3-20; Ex. 7 (bankruptcy petition).  He was represented by counsel

20 in the filing of the bankruptcy.  Hoppe Dep. at 43:15-20.  He did not disclose any potential claims

21 against Zep in his bankruptcy petition.  *See* Hoppe Dep., Ex. 7, Schedule B, Nos. 21, 35 (requiring

22 disclosure of "contingent and unliquidated claims of any nature," and "other personal property of

23 any kind").  He obtained a discharge of his bankruptcy on January 25, 2011, and his bankruptcy

24 case was closed on February 1, 2011.  See Dkt. No. 163, Request for Judicial Notice ("Hoppe

25 RJN"), Ex. 1.

26     Hoppe states that he did not know he had a potential claim against Zep when he filed for

27 bankruptcy.  Hoppe. Dec., ¶¶ 4, 7.  He testified that the first time he learned of the claims was

28 eight months after his bankruptcy case was closed, when he received a letter from Zep dated

October 14, 2011, offering him a settlement for the Britto action. Hoppe Dep. at 35:9-13, 39:7-20; Ex. 3. The letter informed him of the details of the Britto Action, offered a monetary settlement for the claims, suggested that he consult with an attorney, and included contact information for the plaintiffs' attorneys. Hoppe testified that a "day or two" after receiving the letter, he "notified the attorneys on this letter and my BK attorney."[2] *Id.* at 40:2-5. On March 15, 2012, he signed the Request and Consent for Joinder to Become a Party Plaintiff in the Britto Action. Hoppe Dep., 41:21-42:23; Ex. 6.

On May 28, 2013, Hoppe filed an Amended Schedule B and an Amended Schedule C in his bankruptcy case, which disclosed his claims against Zep. RJN, Ex. 3. In the Amended Schedule B and Amended Schedule C, he attested that the "full value" of his interest in his claims against Zep was "approx. $50K-$60K" and the "current value" of the claim, without deducting any secured claim or exemptions, was $30,000. Hoppe RJN, Ex. 3 (Schedule B No. 21, Schedule C). On February 16, 2014, the bankruptcy trustee moved to reopen Hoppe's case, which the court granted. Hoppe RJN, Exs. 4, 5. On March 3, 2014, Hoppe filed another Amended Schedule B and Amended Schedule C which also disclosed the claim against Zep. Hoppe RJN, Ex. 7.

On March 7, 2014, Hoppe moved to compel the trustee to abandon his claims against Zep on the ground that it was "of inconsequential value and benefit to the estate." Hoppe RJN, Ex. 8. On April 4, 2014, he moved for an entry of default order granting the motion to compel because the trustee did not oppose the motion or request a hearing. Hoppe RJN, Ex. 10. The bankruptcy court granted the motion to compel on April 7, 2014. Hoppe RJN, Ex. 11. On April 23, 2014, the trustee submitted a Report of No Distribution in which she stated that there was no property available for distribution above what was exempted by law and that the estate had been fully administered. Hoppe RJN, Ex. 2. Hoppe's bankruptcy case was closed on April 24, 2014. *Id.*

**D. Facts Pertinent to Plaintiff Theron Lee**

Theron Lee was hired by Zep in October 2005 as an outside sales representative. He serviced customers in an area ranging from Sacramento, California to western Nevada. Until

United States District Court
Northern District of California

---

[2] Hoppe uses the term "BK" to refer to bankruptcy. Hoppe Dep. 43:4-6.

2007, he worked his territory from his home in Sacramento.  In April of 2007, he moved to Nevada at the request of his supervisor, who asked him to live closer to his territory.  Lee Dep., 18:2-4; Lee Dec., ¶ 8.  Lee inherited a number of accounts in Nevada from a former sales representative who had left Zep, and part of his job was to re-establish business in that market.  *Id*., 18:13-17, 19:10-16.  He continued reporting to his California supervisors after he moved to Nevada.  Lee Dec., ¶ 9.

After relocating in April 2007, Lee maintained a California bank account where his paychecks from Zep were directly deposited.  *Id*. at 16:10-23.  He established his home office in Nevada, obtained a Nevada driver's license, registered and insured his car in Nevada, and voted in Nevada.  *Id*. at 14:20-15:1, 16:10-23, 25:8-23.  His internet service connection and cell phone was billed to his address in Nevada, and any shipments he received from Zep came to his address in Nevada.  *Id*. at 25:8-23.  He still lives in Nevada.  *Id*. at 9:17- 19.

Lee testified that he spent half his time in Nevada, and the other half in California.  Lee Dec., ¶ 5.  He began his work day at his home in Nevada, traveled across the border into California for part of the day, and ended back home in Nevada.  Lee Dep., 20:4-7.  He testified that once or twice per month he traveled to California and stayed in California overnight "because of the distance."  *Id*. at 20:8-15.  His employment with Zep ended in January 2011.  Grossman Dec., ¶ 7.  From 2007 until his employment terminated in January 2011, he made approximately 1477 sales to Nevada customers totaling $431,057 in revenue, and 754 sales to California customers totaling $274,568.  Ward Dec., ¶ 4.

## PROCEDURAL BACKGROUND

A review of the history and procedural background of this case is important for purposes of analyzing the effect of the plaintiffs' bankruptcy filings.  On December 30, 2010, former Zep employees Keith Britto and Justin Cowen filed a putative class action in the Superior Court of California for Alameda County captioned *Britto, et al. v. Zep Inc., et al.*, Case No. VG10553718 ("Britto Action"), alleging that Zep had violated California law by improperly deducting work-related expenses from sales representatives' wages.  Calle, Hoppe, and Lee were unnamed putative class members.  On March 14, 2012, Calle and Hoppe signed a Request and Consent for Joinder to

1    Become a Party Plaintiff in the Britto Action.  Calle Dep., 32:5-16, Ex. 2; Hoppe Dep., 41:21-

2    42:23, Ex. 6.  The Superior Court granted the motion to intervene on July 30, 2012.  Suh Dec., ¶ 7,

3    Ex. G.  The California Court of Appeal reversed the decision to grant intervention on December

4    20, 2012.  Suh Dec., ¶ 8, Ex. H.

5           On December 24, 2012, the plaintiffs filed this case in the Superior Court for the State of

6    California, Alameda County, in which the plaintiffs allege causes of actions for: (1) failure to pay

7    wages under California Labor Code §§ 200, 201, 202, 203, 204, & 221; (2) failure to reimburse

8    work-related expenses under California Labor Code § 2802; (3) failure to provide accurate wage

9    statements under California Labor Code § 226; and (4) unfair competition under California

10   Business and Professions Code § 17200 *et seq.*  *See* Dkt. 1, Ex. A (Complaint); Dkt. 40 (First

11   Amended Complaint).  Defendants removed the action to this court on February 8, 2013.  Dkt. 1.

12          On February 28, 2013, in the Britto Action, Zep moved for summary judgment on plaintiff

13   Keith Britto's claims on the grounds that he was judicially estopped from bringing claims he failed

14   to disclose in his bankruptcy petition, and that he lacked standing to pursue the claims because

15   they were property of the estate.  Suh Dec., ¶ 9, Ex. I.  On August 19, 2013, the court granted

16   Zep's motion for summary judgment in part and granted leave to amend the complaint to add the

17   bankruptcy estate as a real party in interest.  Suh Dec., ¶ 12; Ex. J.

18                                           **LEGAL STANDARD**

19          Summary judgment is proper "if the movant shows that there is no genuine dispute as to

20   any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

21   56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue

22   of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however,

23   has no burden to disprove matters on which the non-moving party will have the burden of proof at

24   trial.  The moving party need only demonstrate to the court "that there is an absence of evidence to

25   support the nonmoving party's case."  *Id.* at 325.

26          Once the moving party has met its burden, the burden shifts to the non-moving party to

27   "designate specific facts showing a genuine issue for trial."  *Id.* at 324 (quotation marks omitted).

28   To carry this burden, the non-moving party must "do more than simply show that there is some

United States District Court
Northern District of California

9

1     metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

2     475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient;

3     there must be evidence on which the jury could reasonably find for the [non-moving party]."

4     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

5          In deciding a summary judgment motion, the court must view the evidence in the light

6     most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255.

7     "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

8     inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

9     summary judgment."  *Id*.  However, conclusory or speculative testimony in affidavits is

10    insufficient to raise genuine issues of fact and defeat summary judgment.  *See Thornhill Publ'g*

11    *Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

12                              **DISCUSSION**[3]

13    **I.   CALLE AND HOPPE'S CLAIMS ARE NOT JUDICIALLY ESTOPPED**

14         Zep contends that under the doctrine of judicial estoppel, Calle and Hoppe's failure to

15    disclose claims against Zep in their bankruptcy petitions now precludes them from bringing those

16    claims in this case.  As explained below, judicial estoppel is inappropriate because there are

17    material issues of fact as to whether their claims of inadvertence or mistake relieve them from

18    estoppel.

19         "The debtor has an ongoing affirmative obligation to disclose all its assets and liabilities to

20    the bankruptcy court in its petition and before discharge, including pending and contingent

21    claims."  *Yoshimoto v. O'Reilly Auto., Inc.*, C 10-05438 LB, 2011 WL 2197697, at *4 (N.D. Cal.

22    June 6, 2011) (citing FED. R. BANK. P. 1007(b)(I); 11 U.S.C. §§ 521(a)(I), 541(a)(I)).  Once

23    appointed, a bankruptcy trustee becomes the representative of the estate and succeeds to the

24    debtor's right to pursue causes of action which are the property of the estate.  11 U.S.C. § 323(a);

25    *see In re Alcala*, 918 F.2d 99, 102 (9th Cir. 1990).  "[A] chapter 7 trustee can . . . prosecute [an

26

27    ───────────────────

28    [3] To the extent that this order relies upon evidence to which there is an objection, the objections are overruled.  To the extent that this order does not rely on such evidence, the objections are overruled as moot.  I have not relied on any inadmissible evidence in deciding this motion.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

action], settle it, abandon it, or arrange for [the debtor] to prosecute it in exchange for the estate receiving a share of the proceeds." *Yoshimoto* at *4 (citation omitted) (alterations in original).

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The Ninth Circuit "invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts." *Id.* at 782 (citation and quotation marks omitted). The doctrine is designed to preserve the integrity of the courts. *Id.*

In the Ninth Circuit, three factors that a court "may consider" in determining whether to apply the doctrine of judicial estoppel are: (1) whether the party's later position is "clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 782-83 (internal quotation marks omitted; citing *New Hampshire v. Maine*, 532 U.S. 742 (2001) (the "New Hampshire factors.")).

In the bankruptcy context specifically, "[j]udicial estoppel will be imposed when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action as a contingent asset." *Id.* at 784; *see also Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 271 (9th Cir. 2013) (stating that, "[i]n the bankruptcy context, the federal courts have developed a basic default rule: If a plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and obtains a discharge (or plan confirmation), judicial estoppel bars the action"); *Hay v. First Interstate Bank, N.A.*, 978 F.2d 555, 557 (9th Cir. 1992) ("recogniz[ing] that all facts were not known to Desert Mountain at that time, but enough

11

1    was known to require notification of the existence of the asset to the bankruptcy court") (emphasis

2    in original).

3           The Ninth Circuit has also held that judicial estoppel will not apply where there was an

4    inadvertent or mistaken omission from a bankruptcy filing.  *Ah Quin*, 733 F.3d at 271.  "The

5    courts have asked not whether the debtor's omission of the pending claim from the bankruptcy

6    schedules was inadvertent or mistaken; instead, they have asked only whether the debtor knew

7    about the claim when he or she filed the bankruptcy schedules and whether the debtor had a

8    motive to conceal the claim . . . . This interpretation of 'inadvertence' is narrow in part because the

9    motive to conceal claims from the bankruptcy court is, as several courts have explained, nearly

10   always present."  *Id.* (citations omitted).   A "key factor" is whether a plaintiff has "reopened her

11   bankruptcy proceedings and filed amended bankruptcy schedules that properly listed the claim as

12   an asset."  *Id.* at 272.  As explained by the Ninth Circuit,

13          "[O]nce a plaintiff-debtor has amended his or her bankruptcy schedules and the
            bankruptcy court has processed or reprocessed the bankruptcy with full
14          information, two of the three primary New Hampshire factors are no longer met.
            Although the plaintiff-debtor initially took inconsistent positions, the bankruptcy
15          court ultimately did not accept the initial position . . . ."

16   *Id.* at 274–75.

17          In these circumstances, rather than applying a presumption of deceit, judicial
            estoppel requires an inquiry into whether the plaintiff's bankruptcy filing was, in
18          fact, inadvertent or mistaken, as those terms are commonly understood.  Courts
            must determine whether the omission occurred by accident or was made without
19          intent to conceal. The relevant inquiry is not limited to the plaintiff's knowledge of
            the pending claim and the universal motive to conceal a potential asset-though
20          those are certainly factors.  The relevant inquiry is, more broadly, the plaintiff's
            subjective intent when filling out and signing the bankruptcy schedules.
21

22   *Id.* at 276–77.  *See also Dunmore v. United States*, 358 F.3d 1107, 1113 (9th Cir. 2004) (failure to

23   disclose may be vitiated by reopening the bankruptcy case and properly disclosing the claims);

24   *Johnson v. Oregon Dep't of Human Resources Rehab. Div.*, 141 F.3d 1361, 1369 (9th Cir. 1998)

25   (when "incompatible positions are based not on chicanery, but only on inadvertence or mistake,

26   judicial estoppel does not apply.").

27          In this case, Calle and Hoppe's positions against Zep were inconsistent with their earlier

28   positions in the bankruptcy courts that they did not have any contingent or liquidated claims of

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    any nature.  However, because Calle and Hoppe have reprocessed their bankruptcies, two of the

2    three New Hampshire factors for judicial estoppel are no longer met: (1) their positions in this

3    instant lawsuit are no longer inconsistent with what is reflected in their bankruptcy petitions; and

4    (2) the presumption of deceit does not obtain and there is no perception that either the bankruptcy

5    court or this court has been misled.  *Ah Quin*, 733 F.3d at 274 (after reprocessing of the

6    bankruptcy "two of the three primary New Hampshire factors are no longer met.")

7          As for the third factor of whether Calle and Hoppe have received an unfair advantage in

8    not disclosing this lawsuit, some courts have viewed that the automatic stay obtained in filing a

9    bankruptcy petition constitutes an unfair advantage.  The Ninth Circuit found that a plaintiff-

10   debtor obtains an unfair advantage where he or she "enjoys the benefit of both an automatic stay

11   and a discharge of debt in his Chapter 7 bankruptcy proceeding."  *Hamilton v. State Farm Fire &*

12   *Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001).  However, in *Ah Quin* the Ninth Circuit found that

13   "[n]othing in *Hamilton* forecloses the possibility that a court could conclude that, whereas an

14   intentional omission (as in *Hamilton*) would result in an unfair advantage, an inadvertent or

15   mistaken omission might not be unfair."  *Ah Quin*, 733 F.3d at 275 n. 6; *See Cagle v. C & S*

16   *Wholesale Grocers Inc.*, 505 B.R. 534, 538 (E.D. Cal. 2014) (court held that the "benefit of the

17   automatic stay is a sufficient 'unfair advantage'" but then assessed whether inadvertence or

18   mistake exception applied).  Following the Ninth Circuit's precedent in *Ah Quin*, I now turn to the

19   evidence of inadvertence/mistake.

20         **A. Calle's Claims**

21         Calle became a plaintiff in the Britto action on March 14, 2012.  He filed for bankruptcy

22   two months later, on May 4, 2012.  On the Statement of Financial Affairs portion of the petition

23   where he was required to identify "suits and administrative proceedings" to which he was "a party

24   within one year immediately preceding the filing of [the] bankruptcy," Calle responded that he had

25   "none."  Calle Dep. Ex. 6 at p. 9, No. 4.  Calle did not disclose his claims against Zep in his

26   bankruptcy petition and supporting schedules until June 13, 2013, approximately four months after

27   Zep asserted judicial estoppel in the Britto Action.

28         Calle states that "in 2013, I learned for the first time that I should have included these

13

1   claims on my bankruptcy schedules.  Soon thereafter, I contacted my bankruptcy attorney to fix

2   my error."  Calle Decl., ¶ 5.  Calle also states that,

> At the time I filed for bankruptcy and submitted my initial schedules, I did not fully
> understand the complicated bankruptcy forms.  As a result, I did not list my claims
> against [Zep] as I did not realize these claims were supposed to be listed on the
> schedules.  This omission is not an intentional effort to defraud the bankruptcy
> court or my creditors, but simply an honest mistake.

6   Calle Dec. ¶ 4

7       On the present record, I find that there are material issues of fact whether Calle's failure to

8   disclose his claims was due to mistake or inadvertence, or to deceit.  On the one hand, Calle filed a

9   declaration in which he swore that, when he reviewed the bankruptcy forms, he did not think that

10  he had to disclose the pending lawsuit because he "did not understand the complicated bankruptcy

11  forms."  Calle Decl. ¶ 4.  On the other hand, the fact that Calle filed for bankruptcy a mere two

12  months after signing a Request and Consent for Joinder to Become a Party Plaintiff in the Britto

13  Action suggests that he knew or should have known that he was a party to a lawsuit, and that the

14  pending claim would be relevant.  Similarly, Calle did not seek to reopen the bankruptcy case until

15  after Zep raised the issue of judicial estoppel, which weighs towards a finding of bad faith.  *See*

16  *Dzakula v. McHugh*, 746 F.3d 399, 401 (9th Cir. 2014) ("Plaintiff here filed false (materially

17  incomplete) bankruptcy schedules and did not amend those schedules until Defendant filed a

18  motion to dismiss this action, suggesting that her omission had not been inadvertent.").

19      Calle's case is akin to the facts of in *Ah Quin*, where the Ninth Circuit found that the

20  plaintiff's declaration created a genuine issue as to whether her nondisclosure was inadvertent.  *Ah*

21  *Qin*, 733 F.3d at 277-78.  The evidence in that case supported "a conclusion either of mistake and

22  inadvertence, or of deceit."  *Id*. at 277.  Many circumstances, such as the fact that the plaintiff

23  amended her bankruptcy schedules after the defendant raised the issue, suggested that the

24  omission had been deceitful.  *Id*. at 278.  But some circumstances supported the conclusion that

25  the omission had been inadvertent.  *Id*. at 277–78.  Of particular note, the plaintiff had "filed an

26  affidavit in which she swore that, when she reviewed the bankruptcy schedules, she did not think

27  that she had to disclose her pending lawsuit because the bankruptcy schedules were 'vague.'"  *Id*.

28  at 277.  The court determined that, "in order to hold that Plaintiff's affidavit-which concerns the

United States District Court
Northern District of California

14

quintessentially personal fact of state of mind - is a sham, the content of the affidavit must be 'blatantly contradicted by the record.'"  *Id*. at 278 (citations omitted).  The court concluded, "viewing the evidence in the light most favorable to Plaintiff, and thus crediting her affidavit, her bankruptcy filing was inadvertent."  *Id*. at 278.  *Compare Dzakula*, 746 F.3d at 401 (finding that omission was not inadvertent because "unlike in *Ah Quin*, Plaintiff presented no evidence, by affidavit or otherwise, explaining her initial failure to include the action on her bankruptcy schedules.").

Here, a jury might well find that Calle's testimony is not trustworthy and that his omission was not mistaken or inadvertent.  Alternatively, and viewing the evidence in the light most favorable to the plaintiff, a reasonable fact-finder could conclude that the omission was inadvertent.  Given the often complex and specialized nature of bankruptcy proceedings, with which most people have no experience, and on this scant record, I cannot make that determination. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 252 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment.").

Furthermore, any unfair advantage to Calle has been minimized because the creditors stand to gain, rather than lose, in permitting this lawsuit to proceed.  *Ah Quin*, 733 F.3d at 275 ("When a plaintiff-debtor amends his or her bankruptcy schedules to include the previously omitted lawsuit, the creditors may now stake a claim in that lawsuit.  By not permitting the civil action to go forward, the creditors lose out on a potential recovery.").  Under Calle's agreement with his bankruptcy trustee, his estate is entitled to receive 25% of any recovery he obtains in this case. Anstine Dec., ¶ 3, Ex. A.  In contrast, if Zep's motion is granted, the estate will receive nothing. Zep's motion for summary judgment on Calle's claims is DENIED.

**B.  Hoppe's Claims**

Hoppe filed for bankruptcy in October 2010, one year before he first learned of the Britto Action.  Hoppe Dep. at 35:9-13, 39:7-20.  Hoppe testified that a "day or two" after receiving the letter, he "notified the attorneys on this letter and my BK attorney."  *Id*. at 40:2-5.  On March 15, 2012, Hoppe signed the Request and Consent for Joinder to Become a Party Plaintiff in the Britto

United States District Court<br>Northern District of California

1   Action.  Hoppe Dep., 41:21-42:23; Ex. 6.  Over one year later, on May 28, 2013, and three months

2   after Zep moved for summary judgment on the grounds of judicial estoppel in the Britto action,

3   Hoppe filed an Amended Schedule B and an Amended Schedule C in his bankruptcy case, which

4   disclosed his claims against Zep.  RJN, Ex. 3.

5         That Hoppe failed to disclose the claim against Zep in his bankruptcy petition, which was

6   filed one year before he first learned of the Britto Action, does not suggest that the omission was

7   deliberate.  The evidence in the record does not demonstrate that Hoppe knew he had a potential

8   claim against Zep when he filed for bankruptcy.  *Compare Hamilton,* 270 F.3d at 784 ("Judicial

9   estoppel will be imposed when the debtor has knowledge of enough facts to know that a potential

10  cause of action exists . . . ."); *Carr v. Beverly Health Care & Rehab. Servs., Inc.*, No. 12-cv-2980

11  EMC, 2013 WL 5946364, at *4 (N.D. Cal. Nov. 5, 2013) (in wrongful termination case, "Mr. Carr

12  had knowledge of the facts giving rise to the lawsuit herein - he had already been terminated from

13  BHRS and had suffered the wrongdoings alleged herein.").  Once he learned of the Britto Action,

14  he informed his bankruptcy attorney within a "day or two," which indicates that Hoppe attempted

15  in good faith to report the claim.[4]  Given these facts, along with the fact that he has re-opened the

16  case and remedied his error, a jury could find that Hoppe's failure to disclose these claims was not

17  an attempt to play "fast and loose with the courts" or a calculated move to obtain discharge

18  through bankruptcy without disclosing his claims in this case.  *See Just Film, Inc. v. Merch. Servs.,*

19  *Inc.*, 873 F. Supp. 2d 1171, 1179 (N.D. Cal. 2012) (finding no evidence of bad faith where

20  plaintiff had told her bankruptcy attorney of her potential claim and the attorney failed to include it

21  on her bankruptcy petition); *Rose v. Beverly Health & Rehab. Servs.*, 356 B.R. 18, 27 (E.D. Cal.

22  2006) ("If evidence existed that Plaintiff had, in fact, attempted in good faith to inform both the

23  creditors and the bankruptcy court that Plaintiff had pending claims, then a case could be made

24  there was a good faith attempt to adequately disclose the existence of the claims against

25

26  _____

27  [4] Hoppe's declaration seems to contradict his deposition testimony.  In his declaration, Hoppe
    stated that he did not tell his bankruptcy attorney about the lawsuit until 2013.  Hoppe Dec., ¶¶ 11-
28  14.  While there may be a factual dispute as to the validity of this statement, I cannot
    dismiss this case based on such dispute.  Hoppe's credibility is a question for the jury.

United States District Court
Northern District of California

1    Defendants"). Because there are material issues of fact whether Hoppe's delay was inadvertent,

2    Zep's motion for summary judgment is DENIED.[5]

3        **II. LEE MAY ASSERT CLAIMS FOR WORK PERFORMED IN CALIFORNIA**

4        Zep asserts that the protections of the California Labor Code do not apply to Calle's claims

5    from September 2008 to March 2009 when he lived and worked in Colorado, and Lee's claims

6    from April 2007 through January 2011 when he lived in Nevada, but worked in both Nevada and

7    California. Dkt. Nos. 1155, 165.

8        Calle does not address Zep's argument in his opposition, and there is no evidence that he

9    performed any work in California once he moved to Colorado. Dkt. No. 195. Lee "does not

10   contend that California law applied to his work outside of California," but he does assert that

11   California laws apply to any work he performed in California. Dkt. No. 192 at 5. Therefore, the

12   only issue that the parties dispute is whether California law applies to the work that Lee performed

13   in California while he was a resident of Nevada.

14       The extraterritorial application of California law is improper where non-residents of

15   California raise claims based on conduct that allegedly occurred outside of the state. *See Sullivan*

16   *v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191

17   (2011). However, extraterritorial application of California law is not barred where the alleged

18   wrongful conduct occurred in California. *See id.*; *Norwest Mortgage, Inc. v. Superior Court*, 72

19   Cal. App .4th 214, 224-225 (1999); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D.

20   Cal. 2008). "California applies its Labor Code equally to work performed in California, whether

21   that work is performed by California residents or by out-of-state residents." *Sullivan*, 662 F.3d at

22   1271.

23   _____

24   [5] Zep asks me "to limit the amount of damages Hoppe may recover to the figure claimed in his amended bankruptcy schedules" but does not cite any precedential authority in support of its

25   request, and I am aware of none. *See* Dkt. No. 160 at 18. The only case cited by Zep, *Payne v. Wyeth Pharmaceuticals, Inc.*, 606 F. Supp. 2d 613 (E.D. Va. 2008), judicially estopped a plaintiff

26   who valued his personal injury claim at $1 million in his bankruptcy petition, but afterwards filed suit for the same claim seeking $25 million in damages. The court found that the vast difference

27   in the amounts showed that "Plaintiff clearly had a motive for concealment when valuing his claim and/or failing to amend after he had filed this lawsuit." *Id*. at 617. Unlike the plaintiff in that

28   case, there is no evidence here that Hoppe undervalued his claims in his bankruptcy proceedings.

United States District Court
Northern District of California

1    In *Sullivan*, employees who were nonresidents of California but who performed some of

2    their work for their employer in California, sought damages under the California Labor Code and

3    California Business and Professions Code section 17200 (California's Unfair Competition Law, or

4    "UCL"). *Id.* The Ninth Circuit held that: (i) the California Labor Code and UCL apply to work

5    performed in California by out-of-state residents; (ii) this holding does not violate the Due Process

6    Clause because the contacts creating California interests are sufficient to permit the application of

7    California's Labor Code because the employer had its headquarters and principal place of business

8    in California, the decision to deny the plaintiffs overtime pay was made in California, and the

9    work in question was performed in California; and (iii) this holding does not violate the Dormant

10   Commerce Clause because "California has chosen to treat out-of-state residents equally with its

11   own." *Id.* at 1270-1272 (citing *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011)).

12   At the hearing, Zep's counsel relied on *Tidewater Marine Western, Inc. v. Bradshaw*, 14

13   Cal. 4th 557 (1996), to argue that California's wage and hour protections do not apply to persons

14   who live outside of California and temporarily work in California. Their reliance is misplaced. In

15   *Tidewater*, the California Supreme Court held that two wage orders applied to plaintiffs who lived

16   and worked within California's boundaries. The court noted generally:

17   The Legislature may have . . . intended extraterritorial enforcement of . . . wage
     orders in limited circumstances, such as when California residents working for a
18   California employer travel temporarily outside the state during the course of the
     normal workday but return to California at the end of the day. On the other hand,
19   the Legislature may not have intended . . . wage orders to govern out-of-state
     businesses employing nonresidents, though the nonresident employees enter
20   California temporarily during the course of the workday.

21   *Id.* at 577-78. The court specifically refrained from holding that "wage orders apply to *all*

22   employment in California, and *never* to employment outside California." *Id.* at 578 (emphasis

23   added). Moreover, the court stated it was not expressing any opinion on whether wage orders

24   apply to employees who work primarily outside of California's boundaries. *Id.* at 579. As stated

25   by the California Supreme Court in *Sullivan*, its holding in *Tidewater* merely "caution[s] against

26   overly broad conclusions about the extraterritorial application of employment laws" but "[n]othing

27   in *Tidewater* suggests a nonresident employee . . . can enter the state for entire days or weeks

28

18

1    without the protection of California law." *Sullivan*, 51 Cal. 4th at 1191.  It does not hold, as Zep

2    contends, that California's labor code and UCL exclude nonresidents.  *Id.* at 1198.

3         In *Maez v. Chevron Texaco Corp.*, No. 04-cv-00790 JSW, 2005 WL 1656908 (N.D. Cal.

4    July 13, 2005),  a case with facts very similar to those here, the court distinguished *Tidewater* and

5    denied summary judgment on the question of whether the plaintiff "would be considered a

6    California employee for purposes of the wage and hour laws."  *Id*. at *3. There, the plaintiff

7    salesman lived in Arizona, but his customer base was in California.  *Id*.  The plaintiff's employer

8    located him in Arizona in order to avoid the high cost of living in California, but the focus of the

9    plaintiff's job was on generating sales in California.  *Id*.  The evidence demonstrated that the

10   plaintiff visited California "a couple of times every month for business."  *Id*.  The court concluded

11   that under *Tidewater*, "the exact scope of California's wage and hour laws is not clear," and held

12   that "[t]he existence of [] questions regarding the scope of California law and the location of

13   Plaintiff's employment precludes summary judgment on this issue."  *Id*.

14        Since the court's holding in *Maez*, which focused on "the location of Plaintiff's

15   employment," several courts have also found that "the critical factor is where the work at issue is

16   performed" by the plaintiff.  *Cotter v. Lyft*, Inc., 13-cv-04065 VC, 2014 WL 3884416, at *3 n.2

17   (N.D. Cal. Aug. 7, 2014) (citing *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078,

18   1099 (D. Ariz. 2010) ("Other courts have similarly concluded that the place where the work takes

19   place is the critical issue"); *Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 900

20   (C.D. Cal. 2009) (focusing on the "situs of employment as opposed to residence of the employee

21   or the employer"); *Priyanto v. M/S Amsterdam*, No. 07-cv-3811 AHM, 2009 WL 175739, at * 8

22   (C.D. Cal. Jan. 23, 2009) ("Plaintiffs cannot show that they work in the state of California, and

23   consequentially cannot show that . . . the California wage and hour laws can be applied to them").

24   *See also Tidenberg v. Bidz.com, Inc.*, 2009 WL 605249, at *4 (C.D. Cal. Mar. 4, 2009) (explaining

25   that the UCL applies to "unlawful conduct [that] took place in California" because "state statutory

26   remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct

27   occurring in California").

28        It is undisputed that Lee worked in California part of the time.  Lee's situation is analogous

United States District Court
Northern District of California

to the plaintiffs in *Maez* and *Sullivan*. *See Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1270 (9th Cir. 2011) (holding that California overtime laws apply to work performed in California by non-resident workers who, from the years 2000 to 2004, worked in California 74 days, 110 days, and 20 days); *Maez*, 2005 WL 1656908, at *3 (holding that whether California labor laws applied to salesman who lived in Arizona but whose customer base was in California was question of fact for the jury). Summary judgment is not proper to the extent Lee can prove that Zep violated California laws relating to work that he performed within California.

Zep also contends that "applying California law extraterritorially would place an undue burden on interstate commerce in violation of the United States Constitution." Dkt. 207 at 7. "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Sullivan*, 662 F.3d at 1271 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985)). A nonresident plaintiff must allege that there is "significant contact or a significant aggregation of contacts to the claims asserted to ensure that application of the state law to a defendant's conduct would not violate the Constitution." *In re Hitachi Television Optical Block Cases*, No. 08-cv-1746 DMS, 2011 WL 9403, at *10 (S.D. Cal. Jan. 3, 2011) (citations omitted) ("Unlike the contacts analysis for purposes of personal jurisdiction, which measures the defendant's contacts with the forum state, the contacts analysis here measures the forum state's contacts with the individual claims.").

There are sufficient California contacts to Lee's claims to permit the application of California law. Lee generated revenue for Zep from his work in California. From 2007 until his employment terminated in January 2011, Lee made approximately 754 sales to California customers totaling $274,568. Ward Dec., ¶ 4. He moved from his home in Sacramento to Nevada at the request of his California supervisor, who asked him to live closer to his sales territory. Lee Dep., 18:2-4; Lee Dec., ¶ 8. He continued reporting to his California supervisors after he moved to Nevada. Lee Dec., ¶ 9. He testified that he spent half of his time in Nevada, and the other half in California. Lee Dec., ¶ 5. These are sufficient contacts to support California's interest in applying its laws. Furthermore, throughout this litigation, Zep has demonstrated that it conducts

substantial business in California through its California offices, has several sales representatives in California, and that it generates substantial revenue from its sales in California. The fact that Zep is a Georgia corporation is not dispositive. *See Wang v. OCZ Tech. Grp., Inc.*, 276 F.R.D. 618, 629-30 (N.D. Cal. 2011) ("Courts evaluating the sufficiency of a state's contacts with the individual class plaintiffs' claims look to the offending activity alleged to have taken place in the state, not solely whether a defendant is incorporated or headquartered there.").

To the extent that Zep attempts to distinguish *Sullivan* because it dealt with California overtime laws and not Labor Code sections 201, 202, 204, 221, 226, and 2802, that argument fails. While *Sullivan* addressed California Labor Code section 510, which governs overtime compensation, there is no reason to limit its holding only to overtime cases. As noted in *Campagna v. Language Line Servs., Inc.*, No. 08-cv-02488 EJD, 2012 WL 1565229 (N.D. Cal. May 2, 2012), "[n]othing suggests that Labor Code § 2802 has any greater or lesser extraterritorial influence than the overtime provisions at issue in *Sullivan* . . . Each law exists to ensure Californians are fairly compensated for their work." *Id.* at *4. Additionally, sections 201, 202, 204, 221, and 226 do not discriminate between in-state and out-of-state residents who work in California. *See* Cal. Lab. Code §§ 201, 202, 204, 221, 226.

Finally, Zep argues that it is entitled to summary judgment because Lee has not provided evidence differentiating between the expenses he incurred for his California work and Nevada work. Dkt. No. 207 at 3-7. The precise portion of expenses and deductions which were incurred as a direct consequence of his duties in California will be addressed at the damages phase of this action. If Lee cannot prove the amounts incurred as a direct consequence of his California duties, then he cannot pursue those claims.

Accordingly, Zep's motion for summary judgment is DENIED with respect to Lee's work in California, and GRANTED concerning his work in Nevada and Calle's work in Colorado.

### III. DEDUCTIONS FROM COMMISSIONS

The plaintiffs move for summary judgment on their claim that Zep's deductions from their commissions for expenses such as credit card fees, samples, novelties, literature, freight charges, minimum order fees, and phone order fees violated California Labor Code section 221. Dkt. No.

128.  Zep's cross motion for summary judgment contends that the deductions were a lawful part of Zep's commissions model because the plaintiffs agreed to the deductions and the deductions were tied directly to the plaintiffs' sales.  Dkt. No. 177.

Section 221 provides, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."  CAL. LAB. CODE § 221.  Commissions are wages within the meaning of section 221. CAL. LAB. CODE § 200 (defining wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.").  Section 221's prohibition reflects "California's strong public policy favoring the protection of employees' wages, including amounts earned through commissions on sales." *Sciborski v. Pac. Bell Directory*, 205 Cal. Ct. App. 4th 1152, 1166 (2012), (citation and quotation marks omitted).  "An employment compensation system which deducts company losses and expenses from employee base pay runs afoul of California public policy." *Naser v. Metro. Life Ins. Co.*, No. 10-cv-04475 EJD, 2013 WL 4017363, at *11 (N.D. Cal. July 31, 2013) (citing *Prachasaisoradej v. Ralph's Grocery Co.*, 165 P.3d 133 (2007)).

"Deductions from such commissions are permitted, however, when (1) the deductions are tied to the employee's sales rather than general business expenses, and (2) the employee agrees to the deductions by contract."  *Marr v. Bank of Am., NA*, 506 F. App'x 661, 661 (9th Cir. 2013) (citations omitted) (affirming *Marr v. Bank of Am.*, No. 09-cv-05978 WHA, 2011 WL 845914 (N.D. Cal. Mar. 8, 2011) (granting summary judgment on section 221 claim where deductions taken in calculating commissions were tied to plaintiff's specific sales, and plaintiff contractually agreed that the deductions would be taken in calculating his commissions).

Employers and employees may agree that an employee must satisfy certain conditions before earning a sales commission and an employer may recoup an advance if these conditions are not satisfied.  For example, an employer may expressly condition an earned sales commission on the sale becoming final (*e.g.*, no returns within a specified time or final payment received) or on the employee completing work in providing follow-up services to the customer.  "However, to rely on those conditions as a basis for recouping an advance paid for a commission, the condition

must be clearly expressed and generally must be set forth in writing."[6] *Sciborski*, 205 Cal. Ct. App. 4th at 1171 (citing *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1333-1337 (2006) (court held that commission plans allowing employer to charge back previously advanced sales commissions when the sales failed to generate revenue was proper where plaintiffs "did expressly agree to the policy in writing"); *Steinhebel v. Los Angeles Times Commc'ns*, 126 Cal. App. 4th 696, 705-706 (2005) (written agreement in which employer charged back commissions when sold subscriptions were terminated within 28 days was not an illegal agreement); *Harris v. Investor's Business Daily, Inc.*, supra, 138 Cal. Ct. App. 4th at 41 (distinguishing *Steinhebel* on basis that, unlike the *Steinhebel* plaintiffs, the employees "did not expressly agree to the chargeback policy in writing")).

"Additionally, the conditions must relate to the sale and cannot merely serve as a basis to shift the employer's cost of doing business to the employee." *Sciborski*, 205 Cal. Ct. App. 4th at 1171 (citing *Hudgins v. Neiman Marcus Grp., Inc.*, 34 Cal. App. 4th 1109, 1111-1112 (1995) (retailer commission policy unlawful because it deducted wages from all employees for "unidentified returns")). Where a deduction is "unpredictable, and is taken without regard to whether the losses were due to factors beyond the employee's control," an employer "cannot avoid a finding that its [commission policy] is unlawful simply by asserting that the deduction is just a step in its calculation of commission income." *Hudgins*, 34 Cal. App. 4th at 1123–1124. An employer may not "require[ ] its employees to consent to unlawful deductions from their wages." *Id.* at 1124. *See also Quillian v. Lion Oil Company*, 96 Cal. App. 3d 156, 157 (1979) (plaintiff's employment agreement included incentive bonus in addition to base pay defined as a dollar amount based on the volume of sales, less the amount of cash and merchandise shortages; court

---

[6] The *Sciborski* court noted that, "[t]he principle that such contractual conditions must be clearly expressed is also embodied in Labor Code section 224, which states that 'Sections 221, 222 and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages when the employer is required or empowered so to do by state or federal law *or when a deduction is expressly authorized in writing by the employee* to cover insurance premiums, hospital, or medical dues, or other deductions not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining . . . .'" *Sciborski*, 205 Cal. App. 4th at 1171 (emphasis in original) (citing CAL. LAB. CODE § 224) (emphasis added).

United States District Court
Northern District of California

1  determined that reduction of the promised bonus by shortages constituted an illegal charge against

2  employee earnings, and made her an insurer of the employer's merchandise); *Kerr's Catering*

3  *Service v. Department of Industrial* Relations, 57 Cal. 2d 319 (1962) (lunch-truck driver received

4  15 percent commission on her own sales exceeding $475 per week, subject to reduction for any

5  cash shortage attributable to the driver for the month; court determined that deductions taken from

6  the sales commissions extended to shortages beyond the driver's control, therefore, deductions

7  effectively made employee an insurer of the employer's merchandise). *Compare*

8  *Prachasaisoradej*, 42 Cal. 4th at 238 (court determined that supplementary incentive

9  compensation did not violate section 221 because employer "absorbed all store costs, and took

10  them as full charges against its own profits . . . then simply determined if there remained any profit

11  to split with its employees . . . over and above their regular wages . . . .").

12       In this case, there are material issues of fact regarding whether some of Zep's deductions

13  violate California Labor Code section 221.  It is undisputed that the plaintiffs did not sign any

14  agreement setting forth Zep's commissions model or the deductions at issue.  However, Zep

15  contends that the plaintiffs' course of conduct created an implied-in-fact contract regarding the

16  calculation of their commissions.  Until recently, commissions agreements based on implied

17  contracts were permissible.[7] *See Melbye v. Accelerated Payment Technologies, Inc.*, No. 10-cv-

18  2040 IEG JMA, 2012 WL 5944644, at *3-4 (S.D. Cal. Nov. 27, 2012) (finding an implied in fact

19  contract for payment of post-termination commissions based on oral statements); *Deleon v.*

20  *Verizon Wireless, LLC*, 207 Cal. 4th 800, 813 (Ct. App. 2012) (employee's acceptance of

21  continued employment constituted acceptance of employer's compensation plan, which included

22  chargeback provision that reduced a sales representative's commissionable sales); *Agnew v.*

23

---

24  [7] California Labor Code section 2751, which requires all commission agreements to be in writing,
   became effective on January 1, 2013.  The events at issue in this case predate section 2751.  The
25  legislative history of section 2751 does not indicate that it is to be applied retroactively.  *Perry v.*
   *Heavenly Valley*, 163 Cal. App. 3d 495, 500 (1985) ("It is a well-established canon of statutory
26  construction that statutes are not to be given a retrospective operation unless it is clearly made to
   appear that such was the legislative intent.") (citation and quotation marks omitted).  Additionally,
27  the case law cited above does not expressly require that commissions agreements be in writing.
   *See Sciborski*, 205 Cal. Ct. App. 4th at 1171 (stating that conditions "*generally* must be set forth in
28  writing"); *Koehl*, 142 Cal. App. 4th at 1337 (finding chargeback valid under Section 221 and also
   that "Section 224 Provides an Independent Basis to Affirm the Chargebacks").

1   *Cameron*, 247 Cal. Ct. App. 2d 619, 624 (1967) (holding that "employer cannot recover excess

2   advances from the employee in the absence of an express or implied agreement or promise to

3   repay any excess of advances made over commissions earned" and noting "the indisputable

4   doctrine that when there is an express or implied promise by the salesman to repay excess

5   advances to his principal, the salesman is obliged to repay the surplus . . . .") (citations omitted).

6           The plaintiffs each received monthly commissions statements that detailed the sales and

7   deductions from which their commissions were calculated.  There is evidence in the record

8   indicating that the plaintiffs understood the contents of their monthly commission statements, the

9   plaintiffs knew that they were responsible for the deductions, and the plaintiffs believed that the

10  deductions were part of Zep's compensation formula.  Calle Dep., 42:23-46:11; Hoppe Dep.,

11  57:25-59:22, 66:5-12; Lee Dep., 62:21-65:8.  On the other hand, there is evidence that the

12  plaintiffs did not receive an explanation of the various deductions in their training, that they were

13  never told that Zep would deduct amounts from their commission for certain items, and that they

14  did not understand the deductions on their monthly commissions statements.  Calle Dep., 97:24-

15  99:11.

16          Even if a contract exists, however, an employer cannot shift the cost of doing business to

17  an employee, and only deductions that are tied to an employee's sales are permitted.  *Sciborski*,

18  205 Cal. Ct. App. 4th at 1171.  The evidence in the record demonstrates that certain deductions

19  had no relationship to the plaintiffs' sales.  Zep deducted costs from the plaintiffs' commissions

20  for credit card fees, repair of Zep equipment for damage not caused by the employee, and a $10

21  deduction for phone orders.  These are all routine business expenses that shift the cost of doing

22  business to the employee and make the employee an insurer of the employer's enterprise.  The fact

23  that the plaintiffs consented to the practice is irrelevant.  *Hudgins*, 34 Cal. App. 4th at 1124 (an

24  employer is not entitled to "require[ ] its employees to consent to unlawful deductions from their

25  wages").  That the plaintiffs were given discretion to utilize certain of these "tools" on a client by

26  client basis does not transform the nature of the expense.  Penalties for phone orders and credit

27  card fees are not "tools" to maximize the employee's sales, but rather shift the cost of business to

28  the employee.  Losses not caused by any fault on the part of the employee, such as equipment

25

repairs, are also impermissible.  *Kerr's*, 57 Cal. 2d at 322 (stating that it is unlawful for the employer to deduct wages not caused by the employee's dishonesty, willful act, or negligence).

Additionally, to make employees responsible for bearing these costs is inconsistent with the public policies underlying section 221. These costs make employees' earnings unstable and subject to unknown variables that they cannot control, and in effect, make the employee the insurer of the employer's business decisions.  Therefore, regardless of whether there is an implied-in-fact contract between the plaintiffs and Zep, these deductions violate section 221 and Zep must reimburse the plaintiffs for them.

The remaining deductions include novelty items and literature, free shipping, free products, costs of returns, rebills, manual invoice adjustments, costs of pursuing collections against customers who did not pay their bills, minimum order fees, and freight on returns.  It is a question of fact for the jury whether there was an implied-in-fact contract concerning these deductions between the plaintiffs and Zep, and whether these deductions were "tied to the employee's sales rather than general business expenses."  *Marr*, 506 F. App'x at 661.  Therefore, plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part, and Zep's cross motion for summary judgment on this claim is DENIED.

**IV. BUSINESS EXPENSES**

I previously held that Zep must reimburse business expenses under California Labor Code section 2802 for the plaintiffs' automobile expenses.  Dkt. No. 106.  Zep now moves for summary judgment claiming that mileage expenses incurred by plaintiffs for travel between home and work, cell phone and internet expenses, and entertainment, meals, and gift expenses, are not recoverable under section 2802.  Dkt. No. 171.

California Labor Code section 2802 requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by that employee in direct consequence of the discharge of his or her duties."  Cal. Labor Code § 2802(a).  "The elements of a claim under Section 2802 are: (i) the employee made expenditures or incurred losses; (ii) the expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and (iii) the expenditures or losses were reasonable

and necessary." *Marr v. Bank of Am.*, No. 09-cv-05978 WHA, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011) (citing *Gattuso v. Harte–Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 568, (2007)). "In addition, the employer 'must either know or have reason to know that the employee has incurred [the] expense.'" *Id.* (citing *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901 (N.D. Cal. 2009)). The right of an employee to expense reimbursements is not waivable. CAL. LAB. CODE § 219(a). Any contract to waive them is null and void. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 951 (2008).

### A.  Mileage expenses

Zep contends that the plaintiffs are not entitled to mileage for their first and last trips of the day between work and home because expenses commuting to the workplace are not reimbursable. Dkt. No. 171 at 5-8.  In *Stevens v. GCS Serv., Inc.*, 281 F. App'x 670 (9th Cir. 2008), the Ninth Circuit determined that where an employee is required to report to a central location each day, he is not entitled to compensation for his commute into work, regardless of whether he is required to use a company vehicle during the commute. *Id.* at 673.  In *Morillon v. Royal Packing Co.*, 22 Cal.4th 575 (2000), the California Supreme Court held that farm workers were entitled to compensation for the time they traveled on their employer's buses from a central departure point to the fields where they were to work. *Id.* at 578.  Fundamental to the court's analysis and holding was the level of control the employer exercised over its employees "by determining when, where, and how" the employees must travel. *Id.* at 586.  The court distinguished "between travel that an employer specifically compels and controls," and "an ordinary commute that employees take on their own." *Id.* 587.  Employees not subject to the control of their employer during their commute "decide when to leave, which route to take to work, and which mode of transportation to use.  By commuting on their own, employees may choose and may be able to run errands before work and to leave from work early for personal appointments." *Id.* at 586–87.

Zep argues that under *Stevens* and *Morillon*, "the degree of 'employer control' over the employee's commute will dictate whether his/her travel time is compensable" and that here, the plaintiffs had "complete discretion and control over their commutes, including aspects such as the distances they would drive, what customers they would visit, their working hours, size of their

United States District Court
Northern District of California

operating territory, the beginning and end of their work day, and the ability to run personal errands." Dkt. 171 at 6. [8]

The facts of this case are distinguishable from *Stevens* and *Morillion*. The plaintiffs worked from home. Zep did not provide an office or fixed location for the plaintiffs to report to each day. Instead, the plaintiffs' work consisted of making sales calls and attending meetings at customers' places of business. Zep determined the plaintiffs' sales territories, which covered large areas. The plaintiffs' first appointment each day varied depending on the customer called on first. The plaintiffs did decide on their own when to leave for work and which route to take. Hoppe Dep., 93:6-94:17; Calle Dep., 68:15-70:3; Lee Dep., 66:17-67:2. However, each time the plaintiffs left home on a given day, they were traveling en route to a customer's location, *i.e.*, they were engaged in business-necessary travel for the purpose of advancing Zep's commercial interests. Zep knew that the plaintiffs were incurring travel expenses to try to make sales to its customers. These were foreseeable expenses that the plaintiffs incurred as a direct consequence of fulfilling their employment duties. As Zep admits, "the most significant part of Plaintiffs' job is to physically visit their customers . . . ." Dkt. No. 171 at 8. The plaintiffs' travel to further Zep's business and for them to earn commissions in making sales was required, not tangential, to their occupation. Hence, the plaintiffs' first and last trips of the day are valid business mileage just like all other trips between customers, and they are reimbursable.

### B. Cell Phone and Internet Expenses

Zep contends that the plaintiffs are not entitled to cell phone and internet expenses because thay have not distinguished between their business and personal use of these items. Dkt. No. 171 at 9-10. Zep does not deny that the plaintiffs incurred these expenses, and that they were expected to use a cell phone and internet in executing their job duties. Plaintiffs could not have performed their duties if they did not use these modes of communication. Zep actively encouraged the

---

[8] Plaintiffs cite cases discussing the "going and coming rule" which bears on an employer's tort liability for injuries sustained during an employee's commute. These cases do not address reimbursement of expenses under section 2802. *See* Dkt. No. 199 at 3-4 (citing *Huntsinger v. Glass Containers Corp.*, 22 Cal. App. 3d 803, 807 (1972); *Hinman v. Westinghouse Elec. Co.*, 2 Cal. 3d 956, 961 (1970); and other cases).

United States District Court
Northern District of California

1     plaintiffs to use the internet to place orders, and penalized them if they did not.  Therefore the

2     plaintiffs incurred cell phone and internet expenses "in direct consequence of the discharge of his

3     or her duties."  CAL. LAB. CODE § 2802.

4         Plaintiffs admit that they used their cell phone and internet for both personal and business

5     purposes and that they would have a cell phone plan regardless of their employment with Zep.

6     Hoppe Dep., 86:21-23, 87:14-19; Calle Dep., 22:16-19, 75:16-19; Lee Dep., 84:8-18 .  However,

7     Zep expected the plaintiffs to incur these expenses, and Zep knew that the plaintiffs were incurring

8     these expenses to their benefit.  It would not be equitable to deny the plaintiffs any recovery for

9     these expenses solely on the ground that they cannot prove to a certainty, at this point, what it

10    would have cost to make other arrangements to meet these company-imposed obligations or

11    exactly what percentage of their cell phone and internet use was for personal rather than business

12    use.  Given that Zep required the plaintiffs to use cell phone and internet, and the expenses were a

13    foreseeable and clearly anticipated cost of doing business, Zep must reimburse these expenses.

14    The precise amounts allocable to personal and business use may be determined at a later stage in

15    this case.

16        **C.  Gifts, Meals, Entertainment**

17        The plaintiffs do not address these expenses in their opposition.  Dkt. No. 199.  Gifts and

18    meals for customers were not required of Zep sales representatives, and Zep was not aware that

19    the plaintiffs incurred these expenses.  Grossman Dec., ¶ 5.  Calle, Hoppe, and Lee claim that they

20    incurred expenses for "gifts" and promotional items.  Lee is the only plaintiff who claims

21    expenses for "meals and entertainment."  Dkt. No. 171 at 2-3.  The fact that not all of the plaintiffs

22    incurred expenses for meals and entertainment indicates that such expenses were not necessary for

23    the performance of a sale representative's job duties.  Furthermore, these expenses were

24    voluntarily incurred by the plaintiffs.  Hoppe Dep., 99:18-100:1; Calle Dep., 25:13-20.  While

25    these costs may have conferred a residual benefit to Zep, the company did not direct sales

26    representatives to incur these expenses, and it did not know that the plaintiffs were incurring these

27    expenses.  Therefore they are not reimbursable.

28        Accordingly, Zep's partial motion for summary judgment on the plaintiffs' expenses

United States District Court
Northern District of California

29

claims is DENIED as to commuting and cell and internet expenses, and GRANTED as to gifts, meals, and entertainment expenses.

## V.  AFFIRMATIVE DEFENSES

The plaintiffs move for summary judgment and to strike Zep's First Affirmative Defense (Failure to State a Claim); Fifth Affirmative Defense (Good Faith); Sixth Affirmative Defense (Consent); Seventh Affirmative Defense (Estoppel); Eighth Affirmative Defense (Laches); Ninth Affirmative Defense (Unjust Enrichment); Tenth Affirmative Defense (Rescission and Restitution); and Thirteenth Affirmative Defense (Unclean Hands).  Dkt. No. 128 at 19-24. Plaintiffs contend that these affirmative defenses should be dismissed because they are untenable as a matter of law.

Federal Rule of Civil Procedure 12(f) provides that a court may strike an affirmative defense if it presents "an insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  The purpose is to avoid spending time and money litigating spurious issues.  See *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993).  A matter is immaterial if it has no essential or important relationship to the claim for relief pleaded. *Id*.  A matter is impertinent if it does not pertain and is not necessary to the issues in question in the case.  *Id*.  Motions to strike are disfavored and "not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Griffin v. Gomez*, No. 98-cv-21038 JW NJV, 2010 WL 4704448, *4 (N.D. Cal. Nov. 12, 2010) (citations omitted).  "Accordingly, once an affirmative defense has been properly pled, a motion to strike which alleges the legal insufficiency of an affirmative defense will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense."  *Id*. (citation and quotation marks omitted).

### A.  First Affirmative Defense (Failure to State a Claim)

Defendant's first affirmative defense asserts that the plaintiffs fail to state a cause of action.  "Failure to state a claim is an assertion of a defect in Plaintiff's prima facie case, not an affirmative defense."  *Barnes*, 718 F.Supp.2d at 1174 ("failure to state a claim under Rule 12(b)(6) is more properly brought as a motion and not an affirmative defense") (citing *Boldstar Tech., LLC*

*v. Home Depot, Inc.*, 517 F.Supp.2d 1283, 1291 (S.D. Fla. 2007) ("Failure to state a claim is a defect in the plaintiff's claim; it is not an additional set of facts that bars recovery notwithstanding the plaintiff's valid prima facie case.  Therefore, it is not properly asserted as an affirmative defense.")).  *See also J & J Sports Prods., Inc. v. Romero*, No. 11-cv-1880 AWI BAM, 2012 WL 2317566, at *4 (E.D. Cal. June 18, 2012) (same).  The plaintiffs have demonstrated that they have tenable claims, and their claims have survived Zep's attempts to narrow this case.  The motion for summary judgment on the first affirmative defense for failure to state a claim is GRANTED, and the defense is STRICKEN.

### B.  Equitable Defenses against the Plaintiffs' UCL Claim

In *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163 (2000), the California Supreme Court explained that "equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful.  It does not follow, however, that equitable considerations may not guide the court's discretion in fashioning the equitable remedies authorized by [the UCL]."  *Id*. at 179.  The equities may be considered when a trial court exercises its discretion to fashion a remedy under the UCL.  *Id*.  Therefore the plaintiffs' motion for summary judgment on Zep's equitable defenses of estoppel, laches, unjust enrichment, recission and restitution, and unclean hands is DENIED to the extent these defenses are asserted against the plaintiffs' remedies under the UCL.

### C.  Equitable Defenses against Plaintiffs' Labor Code Claims

Fifth Affirmative Defense (Good Faith):  Plaintiffs have brought claims under California Labor Code section 203, which permits employees to recover penalties when an employer "willfully fails to pay . . . any wages of an employee who is discharged or who quits," and California Labor Code section 226, which permits employees to recover statutory penalties "as a result of a knowing and intentional failure by an employer" to provide accurate wage statements.  CAL. LAB. CODE §§ 203, 226.  "The good faith defense to the willfulness element of these sections is clearly established under California law."  *Pedroza v. PetSmart, Inc.*, No. 11-cv-298 GHK DTB, 2012 WL 9506073, at *4 (C.D. Cal. June 14, 2012) (citing *Nordstrom Comm'n Cases*, 186 Cal.App.4th 576, 584 (2010) ("There is no willful failure to pay wages if the employer and

31

1   employee have a good faith dispute as to whether and when the wages were due.”)).  California’s

2   administrative regulations also state that “a good faith dispute that any wages are due will preclude

3   imposition of waiting time penalties under Section 203.”  CAL. CODE REGS., TIT. 8, § 13520.

4   Therefore Zep’s good faith defense is a tenable defense against the plaintiffs’ labor code claims

5   and if successful, could preclude the plaintiffs from recovering.  The motion for summary

6   judgment on the fifth affirmative defense of good faith is DENIED.

7        Sixth Affirmative Defense (Consent):  While an employee cannot consent to an illegal act

8   or waive their right to wages owed or to reimbursement of expenses, *see* CAL. LAB. CODE §§ 2804,

9   206.5, 219, as detailed in this order, there are material issues of fact whether plaintiffs had a valid

10  implied-in-fact contract with Zep regarding certain allegedly lawful deductions taken from their

11  commissions.  Plaintiffs’ motion for summary judgment on the sixth affirmative defense is

12  DENIED.

13       Seventh Affirmative Defense (Estoppel) and Eighth Affirmative Defense (Laches):  Zep

14  may not assert equitable estoppel and laches to directly defeat the plaintiffs’ California Labor

15  Code claims.  *Stuart v. Radioshack Corp.*, 259 F.R.D. 200, 203-204 (N.D. Cal. 2009).  However,

16  Zep has asserted that estoppel should bar Calle and Hoppe’s claims because they failed to disclose

17  this lawsuit in their bankruptcy proceedings.  As discussed in this order, there are material issues

18  of fact whether the plaintiffs’ omissions resulted from inadvertence or mistake, and therefore it is

19  possible that a jury might find that the plaintiffs’ are judicially estopped from asserting their

20  claims.  Because there are issues of fact that remain to be determined, the motion for summary

21  judgment on the seventh and eighth affirmative defenses is DENIED.

22       Ninth Affirmative Defense (Unjust Enrichment):  Under California law, “[p]rinciples of

23  equity cannot be used to avoid a statutory mandate.”  *Ghory v. Al-Lahham*, 209 Cal. Ct. App. 3d

24  1487, 1492 (1989) (holding that former employer could not assert unjust enrichment as an

25  equitable defense).  Given that the plaintiffs’ claims are for wages which were not paid to them, it

26  is difficult to conceive of a plausible defense that the plaintiffs have been unjustly enriched to

27  Zep’s detriment.  Zep’s opposition does not address unjust enrichment and therefore Zep does not

28  sustain its burden of proof at summary judgment with respect to this affirmative defense.  *Clark v.*

United States District Court
Northern District of California

1 | *Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006).  The plaintiffs' motion

2 | for summary judgment on the ninth affirmative defense for unjust enrichment is GRANTED to the

3 | extent it is asserted against the plaintiffs' Labor Code claims.

4 |      Tenth Affirmative Defense (Rescission and Restitution):  Because there is an issue of fact

5 | on whether a contract existed between the plaintiffs and Zep, the motion for summary judgment on

6 | the tenth affirmative defenses is DENIED.

7 |      Thirteenth Affirmative Defense (Unclean Hands):  Zep's opposition does not address the

8 | unclean hands defense.  Zep bears the burden of proof at summary judgment with respect to an

9 | affirmative defense.  *Clark*, 460 F.3d at 1177.  The plaintiffs' motion for summary judgment on

10 | the thirteenth affirmative defense for unclean hands is GRANTED to the extent it is asserted

11 | against the plaintiffs' Labor Code claims.

12 | **VI.  HOPPE'S CLAIMS UP TO DECEMBER 2007**

13 |     From his hire to about December 2007, Hoppe was paid on a salary basis under the "Genesis"

14 | program, which was a training program for newly hired sales representatives.  Ward Dec., ¶ 12.

15 | During his time in the program, Hoppe did not incur the purported commissions deductions at

16 | issue in this litigation.  *Id.*  Hoppe testified that sales representatives on the Genesis program did

17 | not pay for free product samples, novelties, and literature, and it was only after he exited the

18 | training program and became a "straight commissions" sales representative that he started

19 | incurring the deductions at issue.  Hoppe Dep. at 27:16-28:2, 28:22-29:7, 32:11-33:8, 70:25-71:5.

20 | Hoppe may not recover amounts for commissions deductions that did not occur.  Zep's cross-

21 | motion for summary judgment on Hoppe's commissions deductions claims under California Labor

22 | Code section 221 for the period while he was in the Genesis program is GRANTED.

23 | **CONCLUSION**

24 |      Zep's motion for summary judgment on the claims of Brian Calle is GRANTED in part

25 | and DENIED in part.  Calle may not assert claims related to work performed outside of California

26 | when he lived and worked in Colorado from September 2008 to March 2009.  Zep has not

27 | established that judicial estoppel applies.

28 |

United States District Court
Northern District of California

1    Zep's motion for summary judgment on the claims of Robert Hoppe is DENIED.[9]

2    Zep's motion for summary judgment on the claims of Theron Lee is GRANTED in part

3 and DENIED in part.  Lee may pursue claims for those expenses which were incurred as a direct

4 consequence of his duties in California from April 2007 through January 2011.  Lee may not

5 assert claims related to work outside of California.

6    The plaintiffs' motion for summary judgment on their commission deduction claims under

7 California Labor Code section 221 is GRANTED in part, and DENIED in part.  The plaintiffs are

8 entitled to reimbursement of deductions for credit card fees, phone order fees, and costs deducted

9 from their wages for repairs not caused by the fault of the plaintiffs.  There are material issues of

10 fact whether the plaintiffs may be reimbursed for other deductions such as novelties and literature,

11 free samples, free freight, minimum order fees, collections, and costs of returned items.

12    Zep's cross-motion for summary judgment is GRANTED in part on Hoppe's commission

13 deduction claims under California Labor Code section 221 from his hire to December 2007 while

14 he was in the Genesis program.  The motion is otherwise DENIED for the reasons stated in the

15 preceding paragraph.

16    Zep's partial motion for summary judgment on plaintiffs' business expense claims under

17 California Labor Code section 2802 is GRANTED in part and DENIED in part.  The plaintiffs

18 must be reimbursed for commuting, cell phone, and internet expenses.  They are not entitled to

19 reimbursement for gifts, meals, and entertainment.

20

21

22

23

24

25

26

27

28

---

[9] Calle and Hoppe both request leave to amend to add the bankruptcy trustee for their estates as party plaintiffs in this case if Zep's motions for summary judgment are granted.  Because this order denies Zep's motions, that request is moot.

34

1    Zep's first affirmative defense for failure to state a claim is STRICKEN. Summary

2  judgment on the ninth affirmative defense for unjust enrichment and the thirteenth affirmative

3  defense for unclean hands is GRANTED to the extent these defenses are asserted against the

4  plaintiffs' California Labor Code claims.

5    **IT IS SO ORDERED**.

6  Dated: August 27, 2014

7  _____

8  WILLIAM H. ORRICK
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28